BALLY MANUFACTURING CORPORATION, A DELAWARE
CORPORATION, APPELLANT, v. NEW JERSEY CASINO
CONTROL COMMISSION, RESPONDENT.

Argued December 1, 1980—Decided March 17, 1981.

*Louis B. Schwartz,* a member of the Pennsylvania bar, argued the cause for appellant (*Sills, Beck, Cummis, Radin & Tischman,* attorneys; *Clive S. Cummis, Louis B. Schwartz* and *Robert A. Goodman,* a member of the Ohio bar, of counsel; *Jerald D. Baranoff* on the brief).

*R. Benjamin Cohen* argued the cause for respondent (*R. Benjamin Cohen*, General Counsel, attorney; *John S. Redden*, Assistant Counsel, on the brief).

*Laurel A. Price*, Deputy Attorney General, argued the cause for *amicus curiae* Attorney General of New Jersey (*John J. Degnan*, Attorney General of New Jersey, attorney; *Laurel A. Price* and *Robert J. Clark*, Deputy Attorneys General, on the brief). ·

The opinion of the Court was delivered by

SULLIVAN, J.

This appeal by Bally Manufacturing Corporation (Bally) presents the question of the legality of a regulation adopted by the New Jersey Casino Control Commission (Commission) which, in substance, prohibits a licensed casino from acquiring more than 50% of its slot machines from any one manufacturer. *N.J.A.C.* 19:46–1.32.[1] Bally is directly affected by the regulation since it manufactures approximately 80% of the slot machines used in the United States.

Bally's basic contentions on appeal are that the regulation is beyond the power and authority given the Commission under the Casino Control Act, *N.J.S.A.* 5:12–1 *et seq.*, violates the Sherman Act, 15 *U.S.C.* § 1 *et seq.*, and the New Jersey Antitrust Act, *N.J.S.A.* 56:9–1 *et seq.*, and is arbitrary and in violation of established principles of due process and equal protection. It is further contended that Bally was denied an evidentiary hearing in the matter in violation of the Administrative Procedure Act, *N.J.S.A.* 52:14B–1 *et seq.*, and contrary to principles of administrative due process and fundamental fairness.

The following background is pertinent to consideration of the issues presented.

---

[1] A casino's compliance with this limitation is conditioned on the availability of a sufficient number of suitable slot machines.

In 1976, Art. IV, § 7, par. 2 of the New Jersey Constitution was amended to make it lawful for the Legislature to authorize by law the establishment and operation, under regulation and control by the State, of gambling houses or casinos in Atlantic City. Pursuant thereto, the Legislature enacted the Casino Control Act under which the New Jersey Casino Control Commission was created with power to license, supervise and control casino gambling in Atlantic City. The act vests broad power over casino operations in the Commission which is authorized to adopt regulations, consistent with the policy and objectives of the act, as it deems necessary or desirable for the public interest in carrying out the provisions of the act. *N.J.S.A.* 5:12–69.

Declaring what the public policy of the State is with regard to casino operations, the act, *inter alia,* states:

An integral and essential element of the regulation and control of such casino facilities by the State rests in the public confidence and trust in the credibility and integrity of the regulatory process and of casino operations. To further such public confidence and trust, the regulatory provisions of this act are designed to extend strict State regulation to all persons, locations, practices and associations related to the operation of licensed casino enterprises and all related service industries as herein provided. In addition, licensure of a limited number of casino establishments, with the comprehensive law-enforcement supervision attendant thereto, is further designed to contribute to the public confidence and trust in the efficacy and integrity of the regulatory process. [*N.J.S.A.* 5:12–1(b)(6)]

Since the economic stability of casino operations is in the public interest and competition in the casino operations in Atlantic City is desirable and necessary to assure the residents of Atlantic City and of this State and other visitors to Atlantic City varied attractions and exceptional facilities, the regulatory and investigatory powers and duties conferred by this act shall include the power and duty to regulate, control and prevent economic concentration in the casino operations and the ancillary industries regulated by this act, and to encourage and preserve competition. [*N.J.S.A.* 5:12–1(b)(12)]

In the main, it is the construction of the provisions of paragraph (12), principally those referring to the power and duty of the commission to "*prevent economic concentration* in the casino operations and the ancillary industries regulated by this act, and *to encourage and preserve competition,*" that is at issue in this appeal. *N.J.S.A.* 5:12–1(b)(12) (emphasis added). It is undisputed that Bally is a casino service industry subject to regulation under the act. *N.J.S.A.* 5:12–12.

 In the course of carrying out its statutory responsibilities, it came to the attention of the Commission that a substantial amount of casino revenues, estimated to be between 40 and 50%, are derived from slot machines. One report submitted to the Commission stated that slot machines "are the cornerstone" of casino operation. The Commission also learned that one manufacturer dominated the domestic slot machine market, accounting for at least 80% of all sales in the United States. This fact caused the Commission concern that market dominance in such a vital area of casino operations was the type of economic concentration that the Casino Control Act sought to prevent. Accordingly, on December 20, 1978, it proposed a regulation which, in substance, prohibited any casino from acquiring more than 50% of its slot machines from any one manufacturer.[2]

The proposed regulation was published in the New Jersey Register as required by the Administrative Procedure Act. 11 *N.J.R.* 108 (1979). Multiple letters, comments and memoranda were received by the Commission in response to this publication. Bally requested an evidentiary hearing, but was advised by letter that the Commission would consider the proposed regulation under its rule making authority and would be acting in its quasi-legislative capacity. The letter stated that presentation of factual testimony through witnesses would be inappropriate but that arguments of counsel would be permitted.

The proposed regulation was considered by the Commission on June 20, 1979 at a public hearing. Counsel for the respective interested parties, including Bally, were heard on the need for and the legality of the proposed regulation. One of the matters discussed was whether a factual basis had to be established for whatever percentage was fixed. After considering the material submitted and hearing argument in the matter, the Commission

---

[2] On December 15, 1978, Bally, aware of the Commission's contemplated action, had submitted its own proposed regulation to the Commission which did not contain any percentage limitation on slot machine purchases by any one casino.

adopted the proposed regulation by unanimous vote. The regulation was then forwarded to and filed by the Secretary of State on June 28, 1979. It provides as follows:

> (a) Unless otherwise approved by the Commission, no more than 50% of the slot machines used in any casino in this State to conduct gaming shall have been manufactured by any one manufacturer or by any enterprise under the direct or indirect control of said manufacturer.
>
> (b) The Commission may modify the said limitation of subsection (a) of this section upon a finding that the casino licensee or applicant for a casino license has made a good faith effort to seek out and obtain slot machines from more than the single manufacturer and that a number of adequate slot machines sufficient to comply with the said limitation are not reasonably available for such use in the said casino.
>
> (c) A casino licensee or an applicant for a casino license may seek modification of the limitation of subsection (a) of this section by filing a verified petition with the Commission alleging sufficient facts to satisfy the standards set forth in subsection (b) of this section.
>
> (d) In response to such a verified petition, the Commission may decide the request summarily, elicit further information from the petitioner or other interested persons, set the matter down for a hearing or adopt such other procedure as may be appropriate under the circumstances. [*N.J.A.C.* 19:46–1.32]

Shortly thereafter Bally filed a Notice of Appeal and a motion for direct certification. This Court granted Bally's motion on May 29, 1980. 84 *N.J.* 447 (1980).

Bally argues that the regulation is invalid because the Casino Control Act does not authorize the Commission to fix mathematical market shares. It points out that the act, which it describes as "one of the most comprehensive pieces of industry legislation in effect in New Jersey," specifies percentages and fixed numbers in numerous areas where it intended that they be used. According to Bally, had the Legislature intended to impose an arithmetical quota upon the sale of slot machines, it would have supplied the desired percentage or, at the very least, indicated that a percentage limitation was desired. Bally also contends that the statutory powers given the Commission to prevent economic concentration and encourage and preserve competition, relate only to the well established principle of "monopoly" in antitrust law. It argues that mere market leadership resulting from customer preference is not contemplated by the act and,

consequently, may not be regulated by the Commission absent a showing of predatory practices.

We find Bally's contentions lack merit. The act specifically provides that "casino operations are especially sensitive and in need of public control and supervision." *N.J.S.A.* 5:12–1(b)(9). Such regulation necessarily requires the exercise of comprehensive power over not only casinos themselves but also over "all related [casino] service industries." *N.J.S.A.* 5:12–1(b)(6). Accordingly, the act expressly requires the Commission to include, in its regulations, provisions "[g]overning the manufacture, distribution, sale, and servicing of gaming devices and equipment." *N.J.S.A.* 5:12–70(i).

In prohibiting "economic concentration" in the casino industry, the Legislature was concerned with the *fact* of economic concentration in casino operations. Its intent was to prevent economic domination in any area related to the industry. As noted, slot machines are vital to gambling operations. If one manufacturer were permitted to dominate this field, casinos would be largely dependent on one source of supply not only for the purchase of machines but also for replacement parts and servicing. Such economic power would have the clear potential for unfair advantage.[3] In addition, chaos in casino operations could result if this one manufacturer ever ceased to be a supplier because of economic difficulties or loss of its manufacturer's license. Therefore, our conclusion is that the regulation in question is within the framework of the broad powers conferred on the Commission by the act.

■ Bally next argues that the Commission's action was knowingly and purposefully targeted against Bally as the one entity affected by the regulation. Since the Commission enact-

---

[3]The situation would be aggravated in this particular case because Bally is also a casino licensee. Were its position sustained, it would control the source of supply, maintenance and repair of slot machines used by its casino competitors.

ment allegedly singled out one entity for special restriction, Bally submits that it was entitled to the evidentiary hearing it had previously requested. In advancing this argument, Bally relies on the hearing provisions in the Administrative Procedure Act, *N.J.S.A.* 52:14B–1 *et seq.*, as well as principles of administrative due process and fundamental fairness.

The Casino Control Act requires that Commission regulations "shall be adopted, amended, and repealed in accordance with the provisions of the 'Administrative Procedure Act.' " *N.J.S.A.* 5:12–69(b). Prior to the adoption of an administrative rule by an agency, the Administrative Procedure Act requires 20 days public notice of the intended action with reasonable opportunity for all interested persons to submit data, views, or arguments, orally or in writing. *N.J.S.A.* 52:14B–4. It is undisputed that the Commission complied with this requirement. Bally, however, contends that the matter should be governed by the provisions for notice and hearing in contested cases, which include the opportunity to present evidence. *N.J.S.A.* 52:14B–9(c). The Administrative Procedure Act defines "contested case" as

a proceeding ... in which the legal rights, duties, obligations, privileges, benefits or other legal relations of specific parties are required by constitutional right or by statute to be determined by an agency by decisions, determinations, or orders, addressed to them or disposing of their interests, after opportunity for an agency hearing. [*N.J.S.A.* 52:14B–2(b)]

Bally maintains that since it was the target of the regulation and the only manufacturer whose rights were affected by the proposed Commission action, it was entitled to the evidentiary hearing on the basis not only of *N.J.S.A.* 52:14B–9(c) but also by principles of fair play and administrative due process.

In this regard, Bally lists a number of alleged factual issues before the Commission with respect to which it contends that it should have been allowed to present evidence. In essence though, Bally's argument is that it was entitled to a hearing on the question whether its "market leadership" was achieved through the quality of its product and customer preference rather than as a result of predatory practices. Bally charges

that it did not have the advantage of hearing the evidence concerning its market leadership, or of learning the precise factual findings upon which the agency based its decision to restrict slot machine sales.

Bally misconstrues the purpose of the regulation. It is not directed at Bally. The restriction applies to any manufacturer who, for whatever reason, occupies a dominant position in the slot machine market in New Jersey. At present, Bally is in that position but should another manufacturer develop an improved type of machine with strong market appeal,[4] the regulation would apply equally to that producer.

The Commission's action was founded on certain basic facts which were not in dispute: (1) the slot machine market was dominated by one manufacturer, (2) there was an absence of significant competition in the sale of slot machines, and (3) slot machines are an important source of casino revenues. In light of these facts, the Commission was obligated to take action to prevent "economic concentration" in the slot machine market and to "encourage and preserve competition." The Commission was not interested in the reasons for the then existing situation in such a sensitive industry. It was the *fact* of market domination and the resultant "economic concentration" which concerned the Commission. Therefore, this was not a contested case requiring an evidentiary hearing and findings of fact. It was, as Bally was advised, an exercise of the Commission's rule making authority. See *Heir v. Degnan*, 82 *N.J.* 109, 119 (1980). Since the regulation was not "directed" at Bally, as previously noted, but was rather a policy decision based on undisputed facts, principles of fair play and administrative due process did not require the evidentiary hearing mandated in *Cunningham v. Dept. of Civil Service*, 69 *N.J.* 13 (1975).

---

[4] At the June 20, 1979 hearing before the Commission, the attorney for another slot machine manufacturer referred to "a new and quite refined machine" which this manufacturer proposed to introduce into New Jersey.

■ The fact that a proposed administrative rule or regulation will have a substantial impact on a particular entity does not, standing alone, require a trial type hearing as a matter of due process. Only where the proposed administrative action is based on disputed adjudicative facts is an evidentiary hearing mandated. *Cunningham v. Dept. of Civil Service, supra.* Professor Davis, in discussing the requirements for an evidentiary hearing in his treatise on administrative law states: "Due process never requires a trial on non factual issues. What is needed on such issues is argument, written or oral, not evidence, and not trial procedure." 2 *Davis, Administrative Law Treatise,* § 12.1 at 406 (2d ed. 1979). Addressing the question whether one who has vital interests involved in an administrative proceeding is for that reason entitled to the protection of trial procedure via an evidentiary hearing, Professor Davis adds:

The proposition stated in the title of this section is obvious but has to be stated because a good deal of law that bears on the proposition is confused. Some courts tend to assume that one who has vital interests at stake in a controversy is for that reason entitled to the protection of trial procedure, whether or not facts are in dispute.

The law clearly is, at a most elementary level, that because a trial is a process for taking evidence subject to cross-examination, and because taking evidence is not appropriate except on disputed facts, trial procedure is not required on issues of law, policy or discretion. [2 *Davis, supra,* § 12.2 at 409–410]

This is precisely the situation in the instant case. As we have noted, the Commission's action was founded on basic undisputed facts. Applying these facts in light of its statutory obligation to prevent economic concentration is such a sensitive and important area of the gambling industry, the Commission, after complying fully with the requirements of the Administrative Procedure Act, adopted the policy expressed in *N.J.A.C.* 19:46.1–32.

■ Bally further contends that, at the very least, the Commission should have established some basis for the 50% limitation and afforded the manufacturer an opportunity to challenge that basis and present countervailing proofs. Absent such an opportunity, Bally claims the 50% limitation is arbitrary and a denial of due process.

As heretofore noted, an evidentiary hearing is not called for by the rule making process. Nor are findings of fact, sufficient to justify the regulations, a required part of the same process. *Heir v. Degnan, supra*, at 119. Admittedly, the selection of any percentage restriction is arbitrary in a sense. A rational basis, however, for the 50% limitation clearly exists. The Commission had a mandate to prevent economic concentration in any and all areas of casino operation. Recognizing that the slot machine industry was dominated by one manufacturer which controlled at least 80% of all slot machine sales, the Commission concluded that this constituted undue economic concentration in an important area of casino operation. To prevent this concentration of economic power, the Commission imposed a 50% limitation on the number of slot machines which a casino could acquire from *any* one manufacturer. While the Commission did not articulate the basis for this percentage, it is clear that the Commission concluded that for any one manufacturer to control more than one-half of the slot machine market in Atlantic City constituted economic concentration within the meaning of the act. The percentage fixed, therefore, has a rational basis. Moreover, the regulation remains subject to modification and change in the light of the Commission's experience with it. Should it prove to be unworkable, unfair or unnecessary, it will be the obligation of the Commission to take appropriate corrective action.

■ Bally's final argument is that the regulation violates state and federal antitrust laws. The contention that the regulation offends the New Jersey Antitrust Act, *N.J.S.A.* 56:9–1 *et seq.*, is misplaced as that statute by its own terms does "not apply to any activity directed, authorized or permitted by any law of this State." *N.J.S.A.* 56:9–5(c). Since we have concluded that the regulation in question is authorized and permitted by the Casino Control Act, the exemption provision of the New Jersey Antitrust Act, therefore, comes into play. *New Jersey Guild of Hearing Aid Dispensers v. Long*, 75 *N.J.* 544, 564 (1978).

Whether the regulation runs afoul of the Sherman Act, 15 *U.S.C.A.* § 1 *et seq.*, presents a different question. Restraints on trade and competition are illegal under the Sherman Act. The United States Supreme Court, however, has established a "state action" exception to the applicability of the Sherman Act. In the seminal decision of *Parker v. Brown*, 317 *U.S.* 341, 63 *S.Ct.* 307, 87 *L.Ed.* 315 (1943), it was held that state regulatory programs were immune from the provisions of the Sherman Act as the Court did not find in that act any legislative purpose to nullify state powers since the act was directed against "individual and not state action." 317 *U.S.* at 352, 63 *S.Ct.* at 314, 87 *L.Ed.* at 326.

Subsequent decisions, upholding the ruling in *Parker v. Brown*, have refined the standards for finding antitrust immunity for state action. See, *e. g., Goldfarb v. Virginia State Bar*, 421 *U.S.* 773, 95 *S.Ct.* 2004, 44 *L.Ed.2d* 572 (1975); *Cantor v. Detroit Edison Co.*, 428 *U.S.* 579, 96 *S.Ct.* 3110, 49 *L.Ed.2d* 1141 (1976); *Bates v. State Bar of Arizona*, 433 *U.S.* 350, 97 *S.Ct.* 2691, 53 *L.Ed.2d* 810 (1977); *New Motor Vehicle Bd. of Calif. v. Orrin W. Fox Co.*, 439 *U.S.* 96, 99 *S.Ct.* 403, 58 *L.Ed.2d* 361 (1978). The United States Supreme Court most recently reviewed the *Parker v. Brown* doctrine in *California Liquor Dealers v. Midcal Aluminum*, 445 *U.S.* 97, 100 *S.Ct.* 937, 63 *L.Ed.2d* 233 (1980). Considering the development of that doctrine in the subsequent decisions regarding antitrust immunity for state action, the Court in *Midcal* stated:

> These decisions establish two standards for antitrust immunity under *Parker v. Brown*. First, the challenged restraint must be "one clearly articulated and affirmatively expressed as state policy"; second, the policy must be "actively supervised" by the State itself. [445 *U.S.* at 105, 100 *S.Ct.* at 943, 63 *L.Ed.2d* at 243 (citation omitted)]

Reviewing the facts of the instant case, we conclude that these standards have been fully satisfied so that the regulation falls within the antitrust immunity established by *Parker v. Brown* and its progeny. First, as we have already held, the regulation is clearly authorized, indeed required, by the expression of State policy contained in the Casino Control Act. *N.J.*

*S.A.* 5:12–1(b)(6) & (12).. Second, there is no question but that this policy is actively supervised by the State itself. The Casino Control Commission has been established as a state agency to regulate not only casinos, but also casino service industries of which Bally is one. In short, the two-prong test set forth in *Midcal* clearly has been met.[5]

Finding no merit in any of the issues raised by Bally on appeal, we conclude that *N.J.A.C.* 19:46–1.32 constitutes a proper exercise, by the Casino Control Commission, of its rule making authority. The validity of that regulation is therefore affirmed.

HANDLER, J., concurring.

I concur in the opinion of the majority of the Court. I write separately to emphasize certain principles of administrative law relating to the rulemaking authority of administrative agencies. These principles, which underlie today's decision upholding the actions of the Casino Control Commission, are codified in our Administrative Procedure Act, *N.J.S.A.* 52:14B–1 *et seq.*, and its legislative progeny creating the Office of Administrative Law, *N.J.S.A.* 52:14F–1 *et seq.*

Most administrative agencies, in the discharge of their regulatory responsibilities, are empowered to make determinations by either promulgating a "rule" or rendering an "adjudication." This authority must be exercised in accordance with the standards of the Administrative Procedure Act (APA). *N.J.S.A.* 52:14B–1 *et seq.*

The Casino Control Commission is fully subject to the strictures of the APA. *N.J.S.A.* 5:12–69(b); *N.J.S.A.* 5:12–107(a). Under the APA, an "adjudication" is a "final determination, decision or order rendered in a contested case." *N.J.S.A.* 52:14B–2(c). The APA defines a "contested case" as

---

[5]Argument could well be made that the effect of the regulation is actually to promote competition rather than restrain it.

> a proceeding ... in which the legal rights, duties, obligations, privileges, benefits or other legal relations of specific parties are required by constitutional right or by statute to be determined by an agency by decisions, determinations, or orders, addressed to them or disposing of their interests, after opportunity for an agency hearing. [*N.J.S.A.* 52:14B–2(b)]

A "rule" is an "agency statement of general applicability and continuing effect that implements or interprets law or policy or describes the organizational procedure or practice requirements of any agency." *N.J.S.A.* 52:14B–2(e).

Administrative agencies enjoy a great deal of flexibility in selecting the proceedings most suitable to achieving their regulatory aims. This is contemplated by the law that created the Office of Administrative Law, *N.J.S.A.* 52:14F–1 *et seq.*, supplementing the APA, and is provided with particularity in the rules adopted under this legislation. *N.J.A.C.* 1:1–1.4 to 1.7; 1:1–2.-2(c) (June 19, 1980). That choice is ordinarily made in terms of whether a particular matter is to be classified by the agency as a "contested case." Thus *N.J.S.A.* 52:14F–7(a) states that "nothing in this ... act shall be construed to deprive the head of any agency of the authority pursuant to section 10 of P.L.1968, c. 410 (C. 52:14B–10) to determine whether a case is contested." See also *N.J.A.C.* 1:1–1.4, n.1 which underscores this, *viz*:

> L.1978, c. 67, amending the Administrative Procedure Act and establishing the Office of Administrative Law to conduct hearings in contested cases provides, in § 9 (*N.J.S.A.* 52:14F–7), that it is the prerogative of the agency heads "to determine whether a case is contested ..." It is the statutory obligation of the Director of the Office of Administrative Law, inter alia, to "develop uniform standards ... (regulating) the conduct of contested cases and the rendering of administrative adjudications" (*N.J.S.A.* 52:14F–5e) and to "advise agencies concerning their obligations under the Administrative Procedure Act...." (*N.J. S.A.* 52:14F–5 h).

Indeed, additional procedural choices are available in the form of declaratory rulings and advisory opinions, *N.J.S.A.* 52:14B–8; *N.J.A.C.* 15:15–9.1, –9.8, which illustrate further the flexibility reposed in agencies to enable them to effectuate fully their administrative aims. The most basic procedural choice in agency proceedings, however, is between rulemaking and adjudication. That decision is, of course, subject to broad guidelines which are derived from judicial decisions, see, *e. g., Cunningham*

*v. Dept. of Civil Service*, 69 *N.J.* 13 (1975) and statute, see *N.J.S.A.* 52:14B–2(b), (e), as well as administrative regulations, see *N.J.A.C.* 1:1–1.4 to 1.7.

These provisions and guidelines recognize the important authority placed in administrative agencies in fulfilling their regulatory responsibilities. The procedural choice as between adjudication and rulemaking is an aspect of that delegated authority and lies within the informed discretion of administrative agencies. These considerations, therefore, strongly counsel judicial deference to the administrative choice between adjudication and rulemaking.[1]

The significance of the choice between rulemaking and adjudication is that it affects the procedure that must be followed in reaching an ultimate agency determination. In particular, as crystallized by the contentions on this appeal, the choice between rulemaking and adjudication has important ramifications in terms of the kind of agency hearing that must be undertaken in the matter. Thus, the type of hearing required for purposes of developing an evidential foundation for the eventual agency disposition may differ markedly depending upon whether that disposition is rulemaking or adjudication.

---

[1]The provision for agency determination in classifying proceedings as between a contested case which entails adjudication and a case to be resolved through rulemaking is parallel to federal administrative agency practice and mirrors the rule of discretionary choice embedded in federal administrative law. See *SEC v. Chenery*, 332 *U.S.* 194, 67 *S.Ct.* 1575, 91 *L.Ed.* 1995 (1947), rehearing denied 332 *U.S.* 783, 68 *S.Ct.* 26, 92 *L.Ed.* 367 (1947); David L. Shapiro, "The Choice of Rulemaking or Adjudication in the Development of Administrative Policy," 78 *Harv.L.Rev.* 921 (1965). Of course these federal principles are not binding on this Court's interpretation of the New Jersey act. We are not today presented with a situation which calls for us to evaluate any federal principles which may be discordant with the aims and wording of our own statutory enactment. Nevertheless, it is well to note that in New Jersey a high degree of discretion in making the appropriate procedural choice lies with the administrative agency itself, *N.J.S.A.* 52:14F–7, *N.J.S.A.* 1:1–2.2(a), and that discretion in these matters is also reposed in the Office of Administrative Law. *N.J.A.C.* 1:1–2.2(c).

In general terms an adjudication requires a trial-type hearing. This hearing is conducted by an administrative law judge (ALJ), *N.J.S.A.* 52:14F–5(n), except in those contested cases where the hearing function has not been delegated by the head of the agency, *N.J.S.A.* 52:14F–8(b). That kind of hearing ordinarily entails the production of competent evidence, frequently testimonial in character, and contemplates the right to confront adverse evidence, usually through cross-examination. In rule-making, however, the "hearing" is not governed by strict procedural requirements or subject to conventional rules of evidence. Frequently, the proceedings permit the incorporation of or reference to evidence developed outside the agency proceedings or the written submissions by interested parties with or without the aid of an ALJ. Compare *N.J.S.A.* 52:14B–9, 10 and *N.J.S.A.* 52:14F–5(n) with *N.J.S.A.* 52:14B–4, 5 and *N.J.S.A.* 52:14F–5(o).[2]

Generally, adjudication is the preferred, if not required, mode where there exist disputed issues of fact which must be resolved in order to determine the rights, duties, obligations, privileges, benefits or other legal relations of specific parties. *N.J.A.C.* 1:1–1.5(a)(3), –1.6(a)(1). This may be especially true where the factual issues most suitably require trial-type procedures or strict rules of evidence for their proper resolution. Contrariwise, where the agency is concerned with "broad policy issues" affecting an entire field or industry, and the proposed final agency action is intended to be applied prospectively, "*in futuro*," rulemaking is the norm. *N.J.A.C.* 1:1–1.6(a)(3), –1.6(a)(7). And, in addition, where factual issues do not necessarily or

---

[2] In this case, even if the choice by the Casino Control Commission were to proceed by way of adjudication, the hearing would not be required to be conducted by an administrative law judge. This, because the Commission has determined not to delegate the hearing function. The Commissioners, who are the decisional officers of the agency, have elected to conduct the hearing themselves. Hence, under *N.J.S.A.* 52:14F–8(b), with respect to such cases, the agency is exempt from the jurisdiction of the Office of Administrative Law and the assignment of an administrative law judge to conduct its hearings. See, *e. g., In re Orange Savings Bank,* 172 *N.J.Super.* 275 (App. Div.1980).

reasonably require development and determination through adversary techniques or conventional evidence rules, rulemaking procedures are appropriate.

The selection between adjudication and rulemaking is based not only upon the form or effect of the final disposition, such as the number of persons affected or its retroactive or prospective effect. The choice ultimately is a matter of which procedure is best tailored to achieve the goals and functions of the agency in the given case. See *N.J.A.C.* 1:1–1.6(a)(3). These objectives can include, for example, investigative factfinding, gathering general information, reconciling conflicts, resolving disputes, developing continuity, rendering advice, achieving clarity, providing flexibility, responding quickly to a particular situation, or acting emergently. See generally, David L. Shapiro, "The Choice of Rulemaking or Adjudication in the Development of Administrative Policy," 78 *Harv.L.Rev.* 921 (1965). Thus, the procedural policy selection—adjudication or rulemaking—must be responsive to the overall agency purpose and function in the context of the particular case, subject of course to the general judicial and legislative guidelines governing administrative agency proceedings.[3]

In the matter at hand, Bally Manufacturing Corporation argues that the Casino Control Commission acted beyond the limits of its discretion in proceeding by rulemaking instead of adjudication. Bally bases its position on the ground that it was the target of the regulation and the only manufacturer whose rights were affected by the proposed Commission action. It contends that the rights and privileges of a "specific" party were determined, bringing the proceedings within the APA definition of a "contested case," *N.J.S.A.* 52:14B–2(b), and obligating the agency to proceed in the adjudicative mode.

---

[3]Although not done in this case, it would be prudent for an agency to provide a written explanation or statement of reasons for its procedural policy choice. *Cf. N.J.A.C.* 1:1–2.2(c).

Although facially attractive, such contentions are overinclusive and ignore the extent to which an administrative rulemaking proceeding may itself be honed so as to adjust to the exigencies of a given situation. Thus even though one party would be specifically affected by the proposed rule, it does not necessarily follow that the preferred proceeding be adjudication rather than rulemaking. There can be rulemaking that originates with and involves a specific party.

Such a concept of specific rulemaking, as a specialized subset of rulemaking in general, is well established in the lexicon of federal administrative law. See 5 *U.S.C.A.* § 551(4). See also, e. g., *Law Motor Freight, Inc. v. C. A. B.*, 364 *F.*2d 139, 142–143 (1 Cir. 1966); *Anaconda Co. v. Ruckelshaus*, 482 *F.*2d 1301, 1306–1307 (10 Cir. 1973); *PBW Stock Exchange, Inc. v. S. E. C.*, 485 *F.*2d 718, 731–733 (3 Cir. 1973), *cert.* den. 416 *U.S.* 969, 94 *S.Ct.* 1992, 40 *L.Ed.*2d 558 (1975); *Hercules, Inc. v. E. P. A.*, 598 *F.*2d 91, 118 (D.C.Cir.1978). See generally Davis, *Administrative Law Treatise* § 5.02 (1958); Davis, *Administrative Law Treatise* §§ 6.38, 7.2 (2d ed. 1979); Note, 87 *Harv.L.Rev.* 782, 785–790 (1974). *Cf. U. S. v. Florida East Coast Railway Co.*, 410 *U.S.* 224, 244–246, 93 *S.Ct.* 810, 820–821, 35 *L.Ed.*2d 223, 239–240 (1973); *American Airlines, Inc. v. C. A. B.*, 359 *F.*2d 624, 630–631 (D.C.Cir.1966) (*en banc*), *cert.* denied 385 *U.S.* 843, 87 *S.Ct.* 73, 17 *L.Ed.*2d 75 (1966). The federal experience, though much more extensive, is not wholly alien to this jurisdiction. An agency determination to proceed in its role as legislator by promulgating a rule, rather than its role as a court by adjudicating, even where a specific party is specially involved, has a sound basis in New Jersey administrative law, *N.J.A.C.* 1–1. 7(a)(3) ("matters which will affect the rights of a specific party, but where there is neither a statutory nor a constitutional right to an adjudicatory hearing, . . . are not contested"), see also *Boller Beverages, Inc. v. Davis*, 38 *N.J.* 138, 151–152 (1962) (tentatively recognizing a category of special rulemaking), and in the legislative analog to specific rulemaking, special legislation, see, e. g., *Hudson Circle Servicenter, Inc. v. Kearney*, 70

*N.J.* 289, 316 (1976) (legislation valid even though only one party is affected, as long as classification has a rational relationship to the purposes of the enactment). Thus, a rulemaking choice to govern particular proceedings is valid even where specific in its impact, if enough other characteristics endemic to rulemaking are present.

Here, the proceedings of the agency have the essential features of legislation necessary for rulemaking to be a valid procedural choice. The rule promulgated by the Casino Control Commission has future or prospective effect. It does not purport to resolve an extant dispute or determine adversary claims. It does not constitute a disposition of particular interests through a retroactive determination. See *N.J.A.C.* 1:1–1.5(a)(3); *N.J.A.C.* 1:1–1.6(a)(4) through 1.6(a)(9); *N.J.A.C.* 1:1–1.7(a)(2) through 1.7(a)(4). The rule is worded generally and could impact directly upon others. Many entities are potentially as well as actually affected—companies which may develop and manufacture an improved slot machine with a strong market appeal, the casino industry and the public in general. The general classification is genuine and not a sham. Moreover, the subject matter of the proceeding is complex, technical and highly sensitive, involving difficult regulatory and economic determinations which are likely best developed through the flexible process that is rulemaking. See *N.J.A.C.* 1:1–1.6(a)(3), –1.7(a)(4), –1.7(a)(5). Therefore the administrative determination to employ the procedural policy choice of specific rulemaking is reasonable, sound and valid.

The validity of the procedural policy choice, however, does not end the inquiry posed in this case. While a full blown hearing in the adjudication sense may not be required, the agency must still determine the appropriate type of hearing that is to be conducted within the relevant procedural mode selected. Thus, even though the procedural choice, as here, involved rulemaking, the hearing procedures to be followed must still be ascertained

and settled.[4] The hearing requirements are to be determined not only as a matter of statutory right, but by evaluating the objectives to be achieved, the interests that are affected by the contemplated regulation and the evidential foundation that must reasonably be developed as a predicate to valid agency action. These considerations implicate principles of fair play and administrative due process and they are relevant in rulemaking proceedings just as in adjudicatory proceedings, although the contours of the fairness standards may differ.

As earlier noted, in the hearing of a contested case involving adjudication in its classic sense certain procedural features must be present. These include reasonable notice, the right to present evidence and to confront adverse evidence, factual findings based upon sufficient and reliable evidence derived exclusively from the record, the opportunity to present argument on all

---

[4]*N.J.A.C.* 1:1–1.6(a)(3) reflects this approach. It recognizes, for example, that even though a case may be fairly classified as "contested" and amenable to adjudication, it may also partake of features that are uncontested in the sense they are "quasi-legislative" and susceptible of "rulemaking." In that hybrid situation the agency proceeding may involve dual approaches. The rule states:

> Contested cases resolve questions relating to the rights, entitlements, and obligations of specific parties even in large, but defined, groups. They do not deal with broad policy issues affecting entire industries or large and undefined classes of people. In some instances an agency's matters may be contested cases (judicial) in part and uncontested cases (legislative or regulatory) in part. It is necessary in each such matter to determine whether the issues can be fruitfully separated or whether the needs of fairness, efficiency, and thoroughness require the issues to be handled in a single, integrated proceeding.

The case here arguably involves the converse situation to that described in *N.J.A.C.* 1:1–1.6(a)(3), namely, one in which a matter is essentially uncontested in the sense that it is quasi-legislative or involves rulemaking but also has certain aspects that reasonably require adjudicative procedures for their proper resolution. While this kind of agency matter is within the contemplation of the APA and the rules of the OAL, for the reasons set forth in the majority opinion, as well as in this concurrence, the present case does not call for the hybridization of adjudicative and rulemaking procedures; rather the rulemaking procedures that were actually employed by the agency were sufficient.

major issues and a final decision similarly confined exclusively to the record. See *N.J.S.A.* 52:14B–9, 10; *N.J.A.C.* 15:15–10.2 to 10.6; *N.J.A.C.* 1.1–6.1 *et seq.* See generally *D. L. & W. R. Co. v. City of Hoboken*, 10 *N.J.* 418, 424 (1952) (findings of fact required); *In re Plainfield-Union Water Co.*, 11 *N.J.* 382, 389 (1953) (parties must have opportunity to refute adverse evidence); *Mazza v. Cavicchia*, 15 *N.J.* 498, 511 (1954) (establishing principle of exclusiveness of record); *Winston v. Bd. of Ed. of So. Plainfield*, 125 *N.J.Super.* 131, 138 (1973), aff'd 64 *N.J.* 582, 586 (1974) (secret hearing examiner's report invalid).

In contrast, the requirements for a hearing in the general rulemaking mode may be considerably different. The statute does not require more than written notice and the opportunity to comment by affected parties, see *N.J.S.A.* 52:14B–4, 5. It does not follow, however, that such broad or loosened hearing requirements will necessarily suffice in all rulemaking. When specific parties are particularly affected by a proposed rule, fair play and administrative due process dictate that an agency must conscientiously concern itself with and make reasonable efforts to accommodate the rights and interests of the affected individual and genuinely account for the individualized effect of its proposed action. *Boller Beverages, Inc. v. Davis, supra*, 38 *N.J.* 138; *Cunningham v. Dept. of Civil Service, supra*, 69 *N.J.* 13. See also *Philadelphia Co. v. S. E. C.*, 175 *F.*2d 808 (D.C.Cir.1948), vacated as moot, 337 *U.S.* 901, 69 *S.Ct.* 1047, 93 *L.Ed.* 1715 (1949); *American Airlines, Inc. v. C. A. B., supra*, 359 *F.*2d 624; *Walter Holm & Co. v. Hardin*, 449 *F.*2d 1009 (D.C.Cir.1971); *Appalachian Power Co. v. E. P. A.*, 477 *F.*2d 495, 500–501 (4 Cir. 1973); Davis, *supra* ; Note, *supra*, 87 *Harv.L.Rev.* at 785–790. *Cf. N.J.A.C.* 1:1–1.7(a)(3). See generally, Estreicher, "Pragmatic Justice: The Contributions of Judge Harold Leventhal to Administrative Law, 80 *Columbia L.Rev.* 894, 909–926 (1980); Davis, "Facts in Lawmaking," 80 *Columbia L.Rev.* 931 (1980). This refinement of the principles applicable generally to rulemaking is exemplified by ratemaking procedures which, although rulemaking in mode, require an evidentiary hearing as

part of the broader proceeding. See, *e. g., Public Service Coordinated Transport v. State,* 5 *N.J.* 196, 214 (1950). This is particularly true where the factual inquiry involves a subject matter that is controversial or unsettled, or there are material and essential facts that are genuinely contested. *Cf. N.J.A.C.* 1:1–1.6(a)(1). The principle extends not only to the type of hearing but also to the thoroughness of the record that is to be developed. See, *e. g., United Hunters of N. J., Inc. v. Adams,* 36 *N.J.* 288 (1962). It is thus noteworthy that administrative law judges, who are especially skilled in the conduct of adjudicatory hearings, may also be employed in rulemaking proceedings. *N.J.S.A.* 52:14F–5(*o*).

Nevertheless, applying these principles to the matter at hand, the rulemaking procedure employed and followed by the Commission in this case was adequate, fair and proper. All that was reasonably necessary in the context of this case was for interested parties, even the party specifically affected, to be given an opportunity to present their positions. Nothing more than written presentations to the Casino Control Commission by Bally was required for the simple, yet cogent, reason, as fully explicated by the majority, *ante* at 333–334, that no material issue of fact existed for which an evidentiary hearing, a more thorough record, or further findings of fact could prove helpful or more fruitful in informing the agency as a basis for its ultimate determination.

These principles, I believe, underlie the opinion of the majority of the Court and I, therefore, join its decision.

PASHMAN, J., dissenting.

I am in general agreement with the majority's conclusions regarding the scope of the Commission's authority to prevent economic concentration and the exemption of the Commission's regulations from the Sherman Act. In implementing the policy announced in *N.J.S.A.* 5:12–1(b)(12), the Commission is not confined to addressing the kind of economic concentration pro-

scribed by antitrust laws. Instead, the Commission may promulgate regulations designed to curb any economic concentration in the casino industry or ancillary service industries in New Jersey that threatens the economic stability of casino operations. Because the Commission is a State regulatory agency, any regulation that is validly promulgated under the Casino Control Act will be "state action" exempt from the scope of the Sherman Act.

In spite of my agreement on these issues, I must dissent from the majority's holding that Bally was not entitled to an evidentiary hearing before the Commission made its final decision. Since I would find the regulation invalid for lack of an adequate hearing, I decline to decide whether the fifty percent rule is arbitrary and capricious in violation of Bally's due process rights.

In reaching its conclusion that Bally was not entitled to an evidentiary hearing, the majority characterizes the Commission's action as "a policy decision based on undisputed facts" and concludes that the proceeding was rule making exempt from the requirement of an evidentiary hearing. Labeling the proceeding rule making only begs the question. The majority disregards the significance of facts which it apparently concedes: that the Commission was reacting to Bally's domination of the domestic slot machine market and that at present only Bally is adversely affected by the Commission's decision. When agency action directly affecting a single party masquerades as a general rule, I believe that principles of procedural due process require an evidentiary hearing.

Ordinarily, a rule making proceeding is directed at a general factual setting or a class of similarly situated persons. In such a case, an individual's complaint of hardship will not entitle him to an evidentiary hearing, *see Heir v. Degnan*, 82 *N.J.* 109, 119 (1980), and his interests will be subordinated to the welfare of the general public, *Willapoint Oysters v. Ewing*, 174 *F.*2d 676, 693 (9th Cir.), *cert.* denied, 338 *U.S.* 860, 70 *S.Ct.* 101, 94 *L.Ed.*

527 (1949). If every person adversely affected by a legislative act or agency rule had a right to a hearing, our form of government could not function. *See Bi-Metallic Investment Co. v. State Board of Equalization*, 239 *U.S.* 441, 445, 36 *S.Ct.* 141, 142, 60 *L.Ed.* 372 (1915).

However, where agency action has an exceptional and immediate effect on a particular person, due process entitles the affected person to a hearing no matter what form of proceeding the agency chooses. *Philadelphia Co. v. Securities and Exchange Commission*, 175 *F.*2d 808 (D.C.Cir.), vacated as moot, 337 *U.S.* 901, 69 *S.Ct.* 1047, 93 *L.Ed.* 1715 (1949); *see Londoner v. Denver*, 210 *U.S.* 373, 28 *S.Ct.* 708, 52 *L.Ed.* 1103 (1908); *Cunningham v. Department of Civil Service*, 69 *N.J.* 13 (1975). As a leading commentator has reasoned, the affected person "should be entitled to a hearing, regardless of . . . the nature of the facts in dispute. . . . From the point of view of the individual concerned, . . . it is the fact that a judicial decision affects him particularly, upon individual grounds, that makes the decision of substantial impact. Even if agency action is legislative under the time test [in that it is prospective in application], if it is particular in its applicability, its effect is much the same as that of an adjudicatory decision." B. Schwartz, *Administrative Law* 204 (1976). Justice Handler has ably supported this principle in his concurring opinion. *Ante* at 345–46.

Rate making proceedings are the most obvious illustration of this rule. Even though setting utility rates is a legislative rather than a judicial function, *Public Service Coordinated Transport v. State*, 5 *N.J.* 196, 214 (1950), when a public utility commission determines the rates that a particular company may charge, due process requires that the agency make its decision only after an evidentiary hearing. *Railroad Commission v. Pacific Gas & Electric Co.*, 302 *U.S.* 388, 393, 58 *S.Ct.* 334, 337, 82 *L.Ed.* 319, 322 (1938). This rule is incorporated into the administrative law of this State. *See N.J.S.A.* 48:2–21(b).

The right to an evidentiary hearing, routinely accepted in rate making proceedings, has also been recognized in other contexts where an agency rule exceptionally affects the interests of a single person or small group of persons. In *Philadelphia Co. v. Securities and Exchange Commission, supra,* the Securities and Exchange Commission issued an order changing the scope of an exemption from the requirements of the Public Utility Holding Company Act of 1953. At the time the rule became effective, Philadelphia Co. was the only company that would have been affected by the changed exemption. The Commissioner promulgated the rule after soliciting written comments and hearing oral arguments, but without affording Philadelphia Co. the evidentiary hearing the company had requested. The Court of Appeals for the District of Columbia Circuit held that the Commission's rule was invalid for lack of an adequate hearing, including the right of the affected party to hear the Commission's evidence, cross-examine witnesses, and introduce evidence on its own behalf, as due process requires. *Id.* at 817. The court stated: "It is elementary that the action of an administrative tribunal is adjudicatory in character if it is particular and immediate, rather than, as in the case of legislative or rule making action, general and future in effect." *Id.* at 816. The Commission's order was particular, since it applied to Philadelphia Co. alone; and it was immediate in effect, because it would influence ongoing reorganization proceedings. As to other companies who in the future might come within the ambit of the order, the court noted that the rule might well be legislative in character. *Id.* at 817. Nevertheless, Philadelphia Co. was entitled to an evidentiary hearing since the action of the Commission particularly and immediately affected its interests. In response to the Commission's contention that none of the relevant factual issues was in dispute, the court observed that "[w]hether or not material issues of fact exist we can determine only after an appropriate hearing and a proper record." *Id.* at 819.

The principle of procedural due process applied in *Philadelphia Co.* and accepted in other cases, *e. g., Appalachian Power Co. v. Environmental Protection Agency,* 477 *F.*2d 495, 501 (4th Cir. 1973); *American Airlines, Inc. v. Civil Aeronautics Board,* 359 *F.*2d 624, 631 (D.C.Cir.) (*en banc*), *cert.* denied, 385 *U.S.* 843, 87 *S.Ct.* 73, 17 *L.Ed.*2d 75 (1966), is also recognized in the statutory and case law of this State. The definition of "contested case" in the Administrative Procedure Act, *N.J.S.A.* 52:14B–2(b), quoted by the majority, *ante* at 332, emphasizes the need to provide an evidentiary hearing to "specific parties" whose interests are affected by agency action. The definition includes those cases where a hearing is "required by constitutional right." This is such a case.

On previous occasions, this Court has emphasized the need for an evidentiary hearing where administrative action is directed at a specific party or situation, even if the action is rule making. In *Boller Beverages, Inc. v. Davis,* 38 *N.J.* 138 (1962), the Court noted that "special rulings," in which an administrator interprets a statute or regulation for the future guidance of all persons who may be affected, "may partake of both rule-making and adjudication." *Id.* at 154. Addressing the proper procedure to be followed in making these rulings, the Court stated that "if the ruling is directed at a specific situation involving a single interest, the dissatisfied party should also be first entitled to a trial type hearing in the agency." *Id.* at 155. More recently, in *Cunningham v. Department of Civil Service, supra,* we held that the "crucial questions" determining the right to an evidentiary hearing are "whether the fact finding involves a certain person or persons whose rights will be directly affected, and whether the subject matter at issue is susceptible to the receipt of evidence." 69 *N.J.* at 22.

The majority would have the right to an evidentiary hearing depend on the existence of disputed facts. *Ante* at 334. I have no quarrel with the general proposition that an evidentiary hearing is "not required on issues of law, policy or discretion." 2 K. Davis, *Administrative Law Treatise* § 12.2 at 410 (2d ed.

1979). But it is inappropriate to decide whether a party has a right to a hearing solely on the basis of a label attached to the matter at issue—a label which is often conclusory. An inquiry into the particularized effect of the proceeding is more consistent with fundamental fairness because it protects against administrative actions that substantially affect the interests of particular persons in the guise of a rule of general applicability. When a rule exerts such a particularized effect, I would be less inclined than the majority to find that there are no disputed facts underlying the agency's decision.

Applying these principles to the present case, I would find that the Casino Control Commission's rule is invalid. Although the "fifty percent" rule is phrased in general terms, there is no doubt that at the present it affects only Bally. Only Bally will lose business. The Commission itself acknowledged in a prepublication version of its statement of policy that the rule was directed at Bally's domination of the market. The transcript of the public hearings held before the rule was promulgated furnishes further evidence that this rule has an individualized impact on Bally and was drafted in response to Bally's market leadership.

The record in this case also indicates that the rule has already affected Bally's sales. When Desert Palace of New Jersey requested permission to purchase 1,500 slot machines from Bally, the Commission limited the purchase to no more than 843 machines, half the number that Desert Palace would be allowed to have in operation in its casino.

Furthermore, the subject matter of the proceeding—whether Bally's present market dominance will adversely affect the economic stability of casino operations in New Jersey—is susceptible to development in an evidentiary hearing. It may be true, as the majority asserts, *ante* at 333, that some of the facts on which the Commission's decision was based are undisputed. But conclusions to be drawn from these facts concerning the potential harm to the New Jersey casino industry are very much in

dispute. Nor is this dispute an abstract question of policy; the Commission was obviously reacting to the particular threat it perceived in Bally's current market leadership. Whether such a threat exists presents a factual question that Bally should have a chance to develop in an evidentiary hearing. Unlike the majority and concurring opinions, I would not allow the Commission, by characterizing the facts as undisputed, to deprive a party whose interests are exceptionally affected of the right to demonstrate that there are disputed facts and to present relevant evidence. Of course, Bally should not be permitted to introduce evidence irrelevant to the issues before the Commission, such as the legality of Bally's market dominance under antitrust laws. That question is immaterial in light of our construction of the phrase "economic concentration" in the Casino Control Act. In short, under principles of due process, since the Commission's action had a particular and immediate impact on Bally alone and depended on facts on which evidence would be pertinent, Bally should have been afforded the evidentiary hearing it requested.

It is perhaps rare that administrative action that is framed in general terms will exert an immediate effect on a particular person and no one else. Nevertheless, where, as here, individualized action is taken under the guise of a general rule, the ordinary principle of representative government, that no individual has a right to an evidentiary hearing before legislative action is taken, must yield to an equally fundamental principle—that an individual has a right to participate in government action that exceptionally affects him.

For these reasons, I dissent from the judgment of the majority and would remand to the Commission for an evidentiary hearing.

*For affirmance*—Justices SULLIVAN, CLIFFORD, SCHREIBER, HANDLER and POLLOCK—5.

*For remandment*—Justice PASHMAN—1.