STATE OF NEW JERSEY, DEPARTMENT OF ENVIRONMENTAL
PROTECTION, PLAINTIFF-APPELLANT, v. M.J. STAVOLA T/A
DRIFTWOOD CABANA CLUB, DEFENDANT-RESPONDENT.

STATE OF NEW JERSEY, DEPARTMENT OF ENVIRONMENTAL
PROTECTION, PLAINTIFF-APPELLANT, v. EDGEWATER
BEACH INC., A NEW JERSEY CORPORATION T/A EDGE-
WATER CABANA CLUB, DEFENDANT-RESPONDENT.

Superior Court of New Jersey
Appellate Division

Argued October 28, 1985—Decided December 12, 1985.

---

Cohen, J.A.D., filed dissenting opinion.

Before Judges FURMAN, PETRELLA and COHEN.

*Dorothy M. Highland,* Deputy Attorney General, argued the cause for appellant (*Irwin I. Kimmelman,* Attorney General of New Jersey, attorney; *Deborah T. Poritz,* Deputy Attorney General, of counsel).

*Michael J. Gross* argued the cause for respondent, M.J. Stavola (*Giordano, Halleran & Ciesla,* attorneys; *Sharlene A. Hunt* on the brief).

*Arthur Dennis Loring* argued the cause for respondent, Edgewater Beach, Inc.

PER CURIAM.

At issue in these consolidated appeals is the applicability of the Coastal Area Facility Review Act (CAFRA), *N.J.S.A.* 13:19-1, *et seq.,* to beach clubs which construct or reconstruct cabanas

with individual amenities. The trial judge concluded that the structures then being built by respondents were not included in the statutory definition of "facility" and refused to order injunctive relief. We now reverse and remand to the Department of Environmental Protection.

The appeals come to us from the trial judge's refusal to grant injunctive relief, rather than from agency action (R. 2:2–3(a)(2)), because the Department of Environmental Protection (DEP) had applied in separate proceedings in the Chancery Division to enjoin M.J. Stavola t/a Driftwood Cabana Club (Driftwood) and Edgewater Beach, Inc., t/a Edgewater Cabana Club (Edgewater) from proceeding with construction pending its determination of the applicability of CAFRA and of the necessity of either or both defendants obtaining a permit thereunder. DEP had brought its suits for injunctive relief pursuant to N.J.S.A. 13:19–18 to enjoin what it considered further violations of CAFRA. DEP had alleged that Driftwood and Edgewater were constructing 25 or more dwelling units or the equivalent on property located in the coastal area and were doing so without either a CAFRA permit or a determination by DEP that CAFRA did not apply to the subject construction. DEP had previously issued "stop orders" to halt the continued construction work, but Driftwood and Edgewater both chose to ignore those orders and substantially completed their respective projects. Neither Driftwood nor Edgewater applied for either a CAFRA permit or a departmental determination that CAFRA did not apply.

From the record it appears that Driftwood and Edgewater had been operating as beach clubs in Sea Bright since some time in the late 1950's. Driftwood embarked on a renovation program in 1985 to upgrade its existing beach club from one and two-story structures housing 483 walk-in change lockers and a one-story structure housing 35 cabanas to two-story structures housing a total of 134 luxury cabanas containing 350 to 450 square feet per cabana, a full bath, dressing area, wet bar, entrance deck and beach deck. The cabanas would have

limited electrical service which would purportedly not accommodate cooking facilities. Apparently most of Driftwood's facilities are located ocean side, or east of the sea wall.

Edgewater likewise upgraded its club from 300–350 lockers, bath houses and cabanas to 100 cabanas whose size would be approximately 10 by 16 feet, and which would include a full bath, 10 foot deck, parlor, electrical outlets, phone jacks, bar area with sink, cabinet and refrigerator. Previously Edgewater accommodated approximately 1,500 people. It is contemplated that the renovated cabanas will service 790 people as a maximum.

At Driftwood, it is intended that the cabanas would be rented for a season by a maximum of six people with a total of four guests. Prior to construction of the cabanas Driftwood's facilities accommodated 2,150 people who leased lockers and cabanas. This number does not reflect guests who also used the facility. Upon the completion of its renovation Driftwood argues that it will accommodate only 804 members, exclusive of permitted guests. None of the cabanas at either location would meet the building code requirements (BOCA) for residential structures. They were not built with insulation and do not contain provisions for heating or air conditioning. Under the rules of each club overnight use of the cabanas is prohibited.

Driftwood also argues that the impact on the beach and surrounding area will be less following construction because: (1) the pilings for the new cabanas are deeper and more sturdy than those of the original cabanas; (2) some of the cabanas are further off the ground than preexisting structures; (3) the new cabanas are located in the same "footprint" as the old cabanas, except they were moved 15 feet pursuant to the borough engineer's request. Driftwood contends that these cabanas are not "dwelling units" or the equivalent as referred to in CAFRA because they do not meet BOCA standards for dwellings and overnight use is prohibited. DEP, on the other hand, contends that construction of these cabanas violates those provisions of

CAFRA which require that any person proposing to construct a "facility" in the coastal area must obtain a permit from DEP prior to beginning construction. *N.J.S.A.* 13:19–5.

In CAFRA the term "facility"[1] is defined in expansive, yet somewhat specific fashion in *N.J.S.A.* 13:19–3 c. The parties appear to agree that if any definition applies, it would come under subsection 3 c(5) which reads:

c. 'Facility' includes any of the facilities designed or utilized for the following purposes:

\*  \*  \*  \*  \*  \*  \*  \*

(5) Public facilities and housing—

Sanitary landfills.

Waste treatment plants (sanitary sewage).

Road, airport or highway construction.

*New housing developments of 25 or more dwelling units or equivalent.* Expansion of existing developments by the addition of 25 or more *dwelling units or equivalent....* [Emphasis added.]

DEP contends that a CAFRA permit is required for 25 or more "cabanas" because they "are similar in size to rooms people traditionally sleep in, have ready access to bathroom facilities, are designed as permanent structures and have generally the same land use and environmental impacts as more traditional housing units."

As noted, although cease and desist orders had been issued to Driftwood and Edgewater in April 1985, both defendants continued working on the construction of the cabanas. Essentially, Driftwood contended that the DEP had no statutory authority to issue the stop-work orders because neither CAFRA nor its implementing regulations, *N.J.A.C.* 7:7–1.1, *et seq.*, provide for issuance of such orders. In declining injunctive relief the trial judge concluded that the definition of "dwelling units or equivalent" was very narrow and did not embrace the types of structure under consideration. The judge thus concluded that

---

[1] The definition section of the statute indicates that those definitions apply "unless the context clearly requires a different meaning." *N.J.S.A.* 13:19–3.

DEP could not regulate this particular type of construction, that the legislative intent of CAFRA was to protect the environment, and that DEP had not shown that this type of construction was any threat to the environment. He dismissed DEP's argument that it did not have sufficient information at the time to come to a decision on how the construction would adversely affect the environment. He concluded that the phrase "dwelling unit or equivalent" should be interpreted based on the intended use of the structures and that in his opinion cabanas are not dwelling units or their equivalent and do not come within the province of CAFRA.[2]

We agree with the DEP that if the definition of facility covers the structures involved here, that it has authority under *N.J.S.A.* 13:1D–9 to enforce the State's environmental statutes, rules and regulations.

One difficulty with the definition section of "Facility" in CAFRA is that it uses the word "facilities" to define itself. A facility is defined in the dictionary as: "... something (as a hospital) that is built, installed or established to serve a particular purpose." *Webster's New Collegiate Dictionary* (1977), (p. 410). That dictionary defines "cabana" as:

> 1: a shelter resembling a cabin usu[ally] with an open side facing a beach or swimming pool
>
> 2: a lightweight structure with living facilities. [p. 153].

The dictionary defines "dwelling" as: "a building or other shelter in which people live (page 355) and defines "living" as: "1: the condition of being alive 2: conduct or manner of life 3 a: means of subsistence: LIVELIHOOD." (p. 673). Finally, "Housing" is defined as: "1 a Shelter, Lodging b: dwellings provided for people 2 something that covers or protects...." (p. 555).

---

[2]The trial judge could simply have grounded his refusal to grant injunctive relief on uncertainty of the applicability of the law. *Citizens Coach Co. v. Camden Horse R.R. Co.,* 29 *N.J.Eq.* 299, 304–305 (E. & A. 1878); *Accid. Index Bur. Inc. v. Male,* 95 *N.J.Super.* 39, 50 (App.Div.1967).

Under CAFRA the DEP is authorized to regulate land use within the coastal zone for the general welfare, *Matter of Egg Harbor Associates (Bayshore Centre),* 94 *N.J.* 358, 364 (1983), and in accordance with the findings set forth in *N.J.S.A.* 13:19–2. After finding that portions of the coastal area were suffering serious environmental effects from the impact of existing facilities and that the coastal area was a unique resource of this State which "should be dedicated to those kinds of land uses which promote the public health, safety and welfare, protect public and private property, and are reasonably consistent and compatible with the natural laws governing the physical, chemical and biological environment of the coastal area," the Legislature stated as one of its purposes:

... to encourage the development of compatible land uses in order to improve the overall economic position of the inhabitants of that area within the framework of a comprehensive environmental design strategy which preserves the most ecologically sensitive and fragile area from inappropriate development and provides adequate environmental safeguards for the construction of any facilities in the coastal area. [*N.J.S.A.* 13:19–2].

DEP is authorized under the Act to adopt regulations to effect the purposes of the Act, including the regulation of "facilities." *N.J.S.A.* 13:19–17. CAFRA also states that: "[t]his act shall be liberally construed to effectuate the purpose and intent thereof." *N.J.S.A.* 13:19–20.

In *N.J.A.C.* 7:7–2.1(a) the regulations adopted pursuant to CAFRA restate the definitions set out in *N.J.S.A.* 13:19–3 c(5). The regulation then continues, in *N.J.A.C.* 7:7–2.1(b), to provide:

(b) The Department interprets the statutory term 'facility' in its broadest sense so as to provide adequate environmental safeguards for the construction of any facility in the coastal area. On the other hand, the Department interprets the statutory intent as excluding relatively minor construction or reconstruction. To that end, the following statutory terms are interpreted as follows.

\* \* \* \* \* \* \* \*

4. 'New housing developments or expansion of existing developments by the addition of 25 or more dwelling units or equivalent' means:

\* \* \* \* \* \* \* \*

v. The construction of 25 or more motel or hotel rooms, camp sites (for tents and/or recreational vehicles), dwelling units in an institution, mobile home sites, or the construction of hospitals or nursing homes with a capacity of 75 or more beds;....

Notwithstanding that in *N.J.A.C.* 7:7E–1.1, *et seq.*, DEP has specified that "recreational structures such as bath houses" have priority over other uses in certain counties, including Monmouth County (*N.J.A.C.* 7E–7.3), here, the DEP found defendants' deluxe cabanas similar enough to dwelling units to be equivalent to them. As noted, DEP analogized the cabanas as being "similar in size to rooms people traditionally sleep in," having "ready access to bathroom facilities," and being "designed as permanent structures and [having] generally the same land use and environmental impacts as more traditional housing units." Proceeding from the inclusion in its regulations of motel and hotel rooms and camp sites, DEP argues that defendants' cabanas have all the amenities of a motel, except for beds. The DEP further argues that the environmental impacts of these cabanas are of the type contemplated by the Legislature when it mandated that the location of "facilities" be regulated. It points out that there will be consumption of potable water in fairly large quantities; generation of waste water; potential impacts on the structures due to storms, and the potential of refuse disposal to be considered, all of which are substantially the same as involved in a traditional housing development.

DEP contends that it is entitled to certain deference with respect to its interpretation of the statute which it is charged by the Legislature with enforcing. *Peper v. Princeton University Board of Trustees,* 77 *N.J.* 55 (1978); *Honachefsky v. N.J. Civil Service Comm'n,* 174 *N.J.Super.* 539 (App.Div.1980).

It appears from the testimony of the prime sponsor of the bill which when enacted, as amended, became CAFRA, that the legislation and certain of the proposed amendments were prepared in bill form for the sponsor by the DEP. Transcript of Public Hearing Before New Jersey Legislature's Assembly

Committee on Air and Water Pollution and Public Health on Assembly Bill No. 1429, on December 11, 1972, p. 23 and 38. Then Commissioner Sullivan of the DEP testified that:

> Essentially what this bill does is describe an area which we think, because of its special character, should have at least a review mechanism at the State level for future development. [*Id.* at 36].

There was no intent to preclude municipal regulation. As the Commissioner stated, what was contemplated was "an environmental type review of whatever is built in this zone, whatever its boundaries, should be given beyond that given by the municipality itself." *Id.* at 43. He had previously commented:

> The bill affirms local control of planning and zoning. Nothing in the bill would interfere with the planning and zoning ordinances now in effect. No municipality would be required to take anything that it doesn't want, in terms of its local zoning ordinances. What the bill provides for is a review, before construction, from an environmental point of view, of those developments that otherwise would be authorized by the local government. [*Id.* at 37.]

There is no doubt that the DEP may make law through either its adjudicatory or rule-making power. *Crema v. N.J. Dept. of Environmental Protection*, 94 *N.J.* 286, 299–300 (1983). The question we face is whether in the circumstances of this case it may fulfill, by its regulations, the "function of filling in the interstices of the [statutory legislation] ... through th[e] quasi-legislative promulgation of rules to be applied in the future." *Securities and Exchange Comm'n v. Chenery Corp.* 332 *U.S.* 194, 202, 67 *S.Ct.* 1575, 1580, 91 *L.Ed.* 1995, 2002 (1947), quoted in *Crema v. N.J. Dept. of Environmental Protection, supra,* 94 *N.J.* at 301.

It is clear from the broad purposes of the Act (*N.J.S.A.* 13:19–2), as well as the charge given to the DEP in *N.J.S.A.* 13:19–16, that CAFRA is expansive legislation.[3] *N.J.S.A.*

---

[3]*N.J.S.A.* 13:19–16 requires the Commissioner of DEP to "prepare an environmental inventory of the environmental resources of the coastal area and of the *existing facilities and land use developments* within the coastal area and an estimate of the capability of the various area within the coastal area to absorb and react to man-made stresses" within two years of the effective date of the Act. (Emphasis supplied.) The commissioner was directed to then develop,

13:19–19 indicates that the act is supplemental and additional legislation in granting the State and local governments regulatory power. That section states:

> The provisions of this act shall not be regarded as to be in derogation of any powers now existing and shall be regarded as supplemental and in addition to powers conferred by other laws, including municipal zoning authority. The provisions of this act shall not apply to those portions of the coastal areas regulated pursuant to enforceable orders under the Wetlands Act, C. 13:9A–1 et seq., section 16 however shall apply to the entire area within the boundaries described herein.

In our view, the rule-making authority granted to DEP, coupled with the admonition of CAFRA that it is to be liberally construed (*N.J.S.A.* 13:19–20), when read in the context of *Crema v. N.J. Department of Environmental Protection, supra,* 94 *N.J.* at 299, requires the conclusion that "dwellings or their equivalent" is sufficiently broad to include the type and number of luxury "cabanas" constructed here. Subsection c(5) of CAFRA includes "public facilities and housing. . . ." There are separate categories for "new housing developments" and "expansion of existing developments," each of which we defined as consisting of 25 or more dwelling units or equivalent. Presumably the number 25 was fixed because the bill (Assembly No. 1429 of 1972) as originally introduced had used the term "Major facility." The term "Major" was deleted by Assembly Committee amendments. Here, defendants were expanding existing developments, notwithstanding a reduction in the number of lockers. We are satisfied that the construction of these cabanas are reasonably susceptible of being considered in the same

using that inventory as a base, "alternate long-term environmental management strategies which take into account the paramount need for preserving environmental values and the legitimate need for economic and residential growth within the coastal area." The legislation then required that the Commissioner, in selecting an environmental design for the coastal area "shall include a delineation of various areas appropriate for the development of residential and industrial facilities of various types, depending on the sensitivity and fragility of the adjacent environment to the existence of such facilities." The Act required presentation of the commissioner's proposal to the Governor and Legislature.

category as motel or hotel units or their equivalent. Neither lack of compliance with BOCA standards nor whether there is overnight use is determinative with respect to CAFRA's applicability. Nor is the test whether other types of facility might be built or reconstructed without permits which are not embraced within the statutory definitions.

The cabanas involved here are not ordinary bath houses or lockers suitable merely for changing, storing clothes and showering. Nor are they the type that would afford just a temporary shelter from the sun during the day. To the extent desired by the occupant, and perhaps limited by the regulations of the respective defendants, they can be essentially lived in during all the daylight hours and the time periods the facilities are open. We conclude that such deluxe cabana facilities are sufficiently equivalent to dwellings, whether or not the cabanas are intended to be used for sleeping, to be considered the type of shelter which can be included within the provisions of the regulation which includes motel and hotel rooms.

The determinations of the trial judge are reversed. In view of the fact that the construction has been substantially completed, we remand the matter to the DEP. We note that with respect to prospective injunctive relief the equities have been fixed as of the dates of the stop orders. Respondents are directed to file applications with the DEP under CAFRA within 20 days of this decision and order. Thereafter, any further proceedings will abide the outcome of any administrative action. Jurisdiction is not retained.

COHEN, J.A.D., dissenting.

Our task is to read *N.J.S.A.* 13:19–3 c to see if defendants' cabana clubs are "facilities" and thus subject to CAFRA. We ought first to read the statute for the ordinary meaning of its words. Reference to general legislative intent is then appropriate, but we ought to start by assuming the Legislature meant

to say what it said, include what it included and omit what it omitted.

*N.J.S.A.* 13:19–3 c does not purport to define "facility." Rather, it makes a list of included property uses. It starts tautologically with the phrase,

"Facility" includes any of the facilities designed or utilized for the following purposes:

There follows a list of 88 different kinds of facilities that are subject to CAFRA, divided into twelve groups. The list is four and one-half pages long in the statute and it would be wasteful to reproduce it here. A reader, however, is immediately struck by two things. The first is the similar character of almost every item on the list. The second is the narrowness of the list in contrast to the breadth of possible statutory application.

The listed uses are almost all heavy industrial uses which present risks of troublesome air and water pollution. The titles of the twelve groupings are revealing. Paraphrased only where necessary, they are: electric power generation; processing of food and food byproducts; incineration wastes; paper production; agri-chemical production; manufacture of inorganic acids and salts; mineral products; chemical processes; storage of petroleum and gas; metallurgical processes; miscellaneous heavy industrial processes, and "public facilities and housing." The last group includes housing developments, along with sanitary landfills, sewage treatment plants and airport and highway construction.

Almost every land use on the lengthy list is a potential abuser of the ecosystem, wherever located, and especially in an environmentally fragile area. But, right in the middle, for a reason that is not apparent, appear housing developments containing twenty-five or more dwelling units or equivalent. They are the only listed uses, other than highways and airports (which carry their own form of environmental impact), which are not always and everywhere thought to be environmentally troublesome.

What has the Legislature omitted from the list? Commercial uses: complexes like Riverside Mall, Woodbridge Mall and Quakerbridge Mall, which involve extraordinary concentrations of people, vehicles and structures, are not subject to CAFRA at all. Office buildings: with local sewage disposal capacity and zoning approval, one could erect Gateway I, the Hughes Justice Complex and New York's twin towers without CAFRA review. Warehouses: one could erect giant dry merchandise storage facilities. Manufacturing: the imagination suggests a host of possibilities not listed in the statute. Among the more striking are auto assembly plants and steel fabrication yards. Additionally, CAFRA is not concerned with restaurants, amusement parks, stadiums, race tracks and, incidentally, beach clubs.

What is one to make of such a skewed and incomplete list? It is hard to say seriously that the Legislature considered twenty-five apartments or a cabana club to have greater environmental impact than Woodbridge Mall, the twin towers or Giants Stadium. It is equally hard to say how it was that housing developments joined a statutory list of uses dangerous to the littoral unless controlled, when so many environmentally troublesome uses were omitted.[1]

One thing is plain. The Legislature did not try to list as "facilities" all uses with potential environmental impact. If it had made that attempt, it would make sense for us to read "housing developments" to include defendants' cabana clubs. If the Legislature inadvertently left a few holes in an otherwise seamless fabric, we might feel called upon to do the necessary mending. But that is not this case and not this statute.

---

[1] A few of the uses omitted from CAFRA, those on the waterfront or in wetlands, may be subject to regulation under the Wetlands Act, *N.J.S.A.* 13:9A-1 *et seq.*, and the Waterfront Development Law. *N.J.S.A.* 12:5-3. DEP does not argue that the statutes dovetail so as to make uses immune from one statute amenable to control under another. Such an argument would not really be valid.

A housing development of "25 or more dwelling units or equivalent" is simply not a cabana club. The majority opinion accurately describes defendants' clubs. People do not live there, either permanently or for short periods. In the summer season, members may spend daylight hours there, as they might at offices, stores, stadiums, assembly plants or restaurants. In such places people also have plumbing, electricity, hot plates and the like. But, no one calls them housing developments. Defendants' cabana clubs have no heat, air conditioning or insulation. They do not meet BOCA code requirements for dwelling units, and overnight occupancy is prohibited.

Even DEP omitted cabana clubs when it wrote its own definition of housing developments for CAFRA purposes. *N.J. A.C.* 7:7–2.1(b)4. It treats the subject in seven subparagraphs. They all deal with "housing developments" and "dwelling units," as ordinary people use those terms, except for subparagraphs v. and vi. In pertinent part, they include:

v. The construction of 25 or more motel or hotel rooms, campsites (for tents and/or recreational vehicles), dwelling units in an institution, mobile home sites, or the construction of hospitals or nursing homes with a capacity of 75 or more beds;

vi. The mooring of 25 or more floating homes in a marina.

Whatever else might be said about the regulation's definition, it is plainly limited to places where people live, even for a brief time, and are sheltered and housed and which are available to them for sleeping and other activities on a twenty-four hour basis. It does not include recreational clubs visited only during summer sunshine hours.

DEP's attention seems to have been drawn to defendants' cabana clubs because they afford individual members the exclusive use of enclosed spaces assigned only to them. Surely, a physically open club, where all members compete daily for access to poolside sun or quiet shade, bathrooms or clothes-changing privacy, is not a "housing development" or a "dwelling." But exclusivity of use does not make a cabana a dwelling any more than it does an enclosed box at Monmouth Park or a private dining room at a seashore restaurant. DEP also rea-

soned that the cabanas have the same environmental impact as more traditional housing units. That consideration apparently does not convince the Legislature to include vast numbers of common property uses in CAFRA's regulatory scope.

One could pick away at the subject forever. The simple fact is, however, that seaside cabanas are not housing developments or dwelling units. This court can make them so only by means of verbal acrobatics which the Legislature has not invited us to perform.