STATE OF NEW JERSEY, DEPARTMENT OF ENVIRONMENTAL PROTECTION, PLAINTIFF-RESPONDENT, v. M.J. STAVOLA, T/A DRIFTWOOD CABANA CLUB, DEFENDANT-APPELLANT.

STATE OF NEW JERSEY, DEPARTMENT OF ENVIRONMENTAL PROTECTION, PLAINTIFF-RESPONDENT, v. EDGEWATER BEACH, INC., A NEW JERSEY CORPORATION, T/A EDGEWATER CABANA CLUB, DEFENDANT-APPELLANT.

Argued May 12, 1986—Decided July 22, 1986.

426

*Michael J. Gross* argued the cause for appellant M.J. Stavola, etc. (*Giordano, Halleran & Ciesla,* attorneys; *Sharlene A. Hunt,* on the briefs).

*Arthur Dennis Loring* argued the cause for appellant Edgewater Beach, Inc., etc.

*Dorothy M. Highland,* Deputy Attorney General, argued the cause for respondent (*W. Cary Edwards, Jr.,* Attorney General of New Jersey, attorney; *Michael R. Clancy,* Deputy Attorney General, of counsel).

The opinion of the Court was delivered by

GARIBALDI, J.

The Coastal Area Facility Review Act (CAFRA), *N.J.S.A.* 13:19-1 to -21, requires that any person proposing to construct a "facility" in the coastal area must obtain a permit from the

Department of Environmental Protection (DEP). A "facility" is extensively defined in CAFRA and includes the construction of "new housing developments of 25 or more dwelling units or equivalent." Appellants, Driftwood Cabana Club (Driftwood) and Edgewater Cabana Club (Edgewater), commenced construction of certain cabana units without securing permits from the DEP. Specifically at issue is whether the beach club cabanas at Driftwood and Edgewater constitute "facilities" under CAFRA. To resolve this question, we first must determine whether DEP has the explicit or implicit statutory authority under CAFRA to hold that a beach club with its newly constructed cabanas is encompassed within the phrase "housing development of 25 or more dwelling units or equivalent" and hence is a "facility." If we answer the first question affirmatively, then we must determine whether DEP in its rules and regulations has properly exercised its authority. We hold that DEP has implicit statutory authority to regulate beach club cabanas but has failed to do so in its present rules and regulations, and that to do so, it must proceed through rulemaking rather than through *ad hoc* adjudication.

I

Driftwood and Edgewater have been operated as beach clubs in Sea Bright since the late 1950's. In 1984, Driftwood decided to renovate and upgrade the existing club from one- and two-story structures housing 483 walk-in change lockers and a one-story structure housing 35 cabanas to a two-story structure housing 134 luxury cabanas. Depending upon the model chosen, each cabana is approximately 350 to 400 square feet, including the entrance deck and beach deck. Each includes a full bath, dressing area, wet bar, cabinet, refrigerator, electrical outlets, and telephone jacks.

In 1983, Edgewater also decided to renovate and upgrade its club from 300 to 350 lockers, bath houses, and cabanas to 100 luxury cabanas whose size would be approximately 10 by 16

feet, and that would include a full bath, 10 foot deck, electrical outlets, telephone jacks, wet bar, cabinet, and refrigerator.

None of the cabanas in either club meets the building code requirements (BOCA) for residential structures, for they do not have kitchen facilities, heat, and air conditioning and are not insulated. Each club is open only during the summer season, from 9:00 A.M. or 10:00 A.M. until midnight. The rules of each club, as well as municipal ordinances, prohibit overnight occupancy. At the close of the season, members must retrieve all personal property and effects from the club. The clubs contend that the renovated cabanas will accommodate fewer people than were accommodated by the former cabanas. Both previously have unsuccessfully sought DEP approval to build condominiums or town houses on the beach club property.

Both clubs' site plans were approved by the Borough of Sea Bright Planning Board. Each received a sewer extension permit from DEP. Although the letters granting the sewer extensions listed twelve items to which the beach clubs were subject, they made no reference to CAFRA. Shortly thereafter, each club received a permit from the Department of Transportation for the construction of access to the roadway, which was not made subject to DEP approval. The building inspector for the Borough of Sea Bright then issued a building permit to each club for the project (these are to be issued only if a project has received all necessary state, county, and municipal permits).

By early April 1985, when a DEP inspector investigated the sites, each club already had expended substantial sums of money—50% of the construction of the Driftwood project was complete, as was 62% of the Edgewater project. Based on the DEP inspections, along with a review of DEP records showing neither a CAFRA permit nor a determination of the inapplicability of CAFRA to the proposed developments, the Supervisor of the North Shore Region of the Bureau of Coastal Enforcement and Field Services issued a cease and desist letter to each club, requiring it either to apply for a CAFRA permit or to stop

construction and restore the property to its former condition. Each club then received a letter from the Director of the Division of Coastal Resources affirming the cease-and-desist letter. Disputing the authority of the DEP to issue such orders, and claiming reliance upon DEP's failure to assert similar authority over at least three other beach clubs on the Jersey Shore that had constructed or improved 25 or more comparable cabanas since the inception of CAFRA in 1973, both clubs ignored the stop orders and continued construction.[1]

DEP then filed verified complaints in the Chancery Division, seeking to enjoin both Driftwood and Edgewater from proceeding with construction. The Chancery Division refused to grant injunctive relief in either case, concluding as a matter of law that "under the enabling legislation [DEP] was not entitled to regulate this particular type of construction." The court based this statutory interpretation on the common-sense notion that a beach club is not a "housing development," just as a cabana is not equivalent to a "dwelling unit." Furthermore, the Chancery Division concluded that even if CAFRA authorizes the DEP to adopt regulations liberally interpreting these statutory terms, its current regulations do not embrace these structures. "If such regulations are going to be imposed," the trial court held, "then those who are being regulated are entitled to know as a matter of fundamental due process what it is that is prohibited, what it is they have to do...."

DEP then appealed to the Appellate Division, which reversed the Chancery Division, remanding the matter to the DEP, with Judge Cohen dissenting. *State Dep't of Envtl. Protection v. Stavola*, 206 *N.J.Super.* 213 (1985). The majority held that "the rulemaking authority granted to DEP, coupled with the admonition of CAFRA that it is to be liberally construed (*N.J. S.A.* 13:19–20), when read in the context of *Crema v. New*

---

[1]Despite the dissent's implied assertion to the contrary, *post* at 629, 633, there has been no determination by DEP that these cabanas will have an adverse impact on the environment.

*Jersey Dep't of Envtl. Protection,* 94 *N.J.* [286, 299 (1983)], requires the conclusion that 'dwellings or their equivalent' is sufficiently broad to include the type and number of luxury 'cabanas' constructed here." *Id.,* 206 *N.J.Super.* at 222.

The dissent disagreed, noting that DEP itself omitted cabana clubs when it wrote its own definition of housing developments for CAFRA purposes. *N.J.A.C.* 7:7–2.1(b)(4). Judge Cohen concluded that "[w]hatever else might be said about the regulation's definition, it is plainly limited to places where people live, even for a brief time...." 206 *N.J.Super.* at 226. And he argued that under the ordinary meaning of the statute, a beach club with cabanas was simply not a "housing development of 25 or more dwelling units or equivalent." *Id.* at 226–27.

Pursuant to Rule 2:2–1(a), Driftwood and Edgewater took this appeal as of right. We now reverse the judgment of the Appellate Division.

## II

First, we lay out the purposes and provisions of the statute, together with the effectuating regulations. In 1973, the Legislature enacted the Coastal Area Facilities Review Act, finding

> that certain portions of the coastal area are now suffering serious adverse environmental effects resulting from existing facility activity impacts that would preclude or tend to preclude those multiple uses which support diversity and are in the best long-term, social, economic, aesthetic and recreational interests of all people of the State.
>
> [*N.J.S.A.* 13:19–2.]

Nevertheless, recognizing the legitimate economic interests of the inhabitants of the coastal area, the Legislature declared as its purpose:

> to encourage the development of compatible land uses in order to improve the overall economic position of the inhabitants of that area within the framework of a comprehensive environmental design strategy which preserves the most ecologically sensitive and fragile area from inappropriate development and provides adequate environmental safeguards for the construction of any facilities in the coastal area.
>
> [*Id.*]

*N.J.S.A.* 13:19–16 directs the Commissioner of DEP to develop such an environmental design strategy, including "a delineation of various areas appropriate for the development of residential and industrial facilities of various types...." Accordingly, under *N.J.S.A.* 13:19–17, the DEP is authorized "to adopt, amend and repeal rules and regulations to effectuate the purposes of this act." And finally, *N.J.S.A.* 13:19–20 proclaims that "[t]his act shall be liberally construed to effectuate the purpose and intent thereof."

But the Legislature did not stop here, giving the DEP free rein to define "facilities," whether through rulemaking or adjudication, as including all residential, industrial, commercial, or recreational structures with potential adverse environmental effects. Instead, CAFRA indicates that " '[f]acility' includes any of the facilities designed or utilized for the following purposes," proceeding to enumerate twelve purposes and to list eighty-eight specific types of industrial and residential facilities. *N.J.S.A.* 13:19–3(c). Most of these are heavy industrial uses that present risks of substantial air and water pollution. The only one arguably relevant among them is:

> (5) Public facilities and *housing*—
> Sanitary landfills
> Waste treatment plants (sanitary sewerage)
> Road, airport, or highway construction.
> *New housing developments of 25 or more dwelling units or equivalent.*
> *Expansion of existing developments by the addition of 25 or more dwelling units or equivalent.*
>
> [ (Emphases added).]

Exercising its authority under *N.J.S.A.* 13:19–17, the DEP has adopted rules and regulations interpreting "facility" and "dwelling units or equivalent." Initially, *N.J.A.C.* 7:7–2.1(a) restates the definitions set out in *N.J.S.A.* 13:19–3(c)(5). Then, *N.J.A.C.* 7:7–2.1(b) provides:

> The Department interprets the statutory term "facility" in its broadest sense so as to provide adequate environmental safeguards for the construction of any facility in the coastal area. On the other hand, the Department interprets the statutory intent as excluding relatively minor construction or reconstruction. To that end, the following statutory terms are interpreted as follows....

4. "New housing developments or expansion of existing developments by the addition of 25 or more dwelling units or equivalent means:

. . . .

[i to iv interpret "dwelling units," v to vi interpret "equivalent"]

v. The construction of 25 or more motel or hotel rooms, campsites (for tents and/or recreational vehicles), dwelling units in an institution, mobile home sites, or the construction of hospitals or nursing homes with a capacity of 75 or more beds;

vi. The mooring of 25 or more floating homes in a marina. For purposes of this subparagraph, a floating home is defined as a waterborne structure designed and intended primarily as a permanent or seasonal dwelling, not for use as a recreational vessel, and which will remain stationary for more than 30 consecutive days. . . .

And so, neither the statute nor the regulations explicitly includes "beach clubs" or "cabanas" among the subject "facilities."

### III

Petitioners contend, and the Chancery Division and the dissent in the Appellate Division agreed, that a plain reading of CAFRA indicates that it does not grant DEP authority to regulate beach club cabanas. There is no question that CAFRA does not explicitly grant DEP authority to regulate beach club cabanas, but this does not end the inquiry.

■ We have long held "that the grant of authority to an administrative agency is to be liberally construed in order to enable the agency to accomplish its statutory responsibilities and that the courts should readily imply such incidental powers as are necessary to effectuate fully the legislative intent." *Department of Labor v. Titan Constr. Co.*, 102 *N.J.* 1, 9 (1985) (citations omitted). Although CAFRA does not give DEP unlimited discretion to define a "facility," the Act does provide that it is to be liberally construed and it does give DEP authority to adopt rules and regulations to effectuate its purposes. DEP is the agency that the Legislature has designated to achieve CAFRA's highly important purpose of protecting our fragile coastal area from adverse environmental impact. Accordingly, we hold that DEP, to work effectively toward fulfill-

ing the legislative purposes of CAFRA, has the necessary implicit statutory authority to promulgate rules and regulations that interpret a seaside beach club cabana as "equivalent" to "a housing development of 25 or more dwelling units."

■ The fact that the statute authorizes the DEP to adopt rules and regulations including cabanas among the structures that are the equivalent of dwelling units (as far as the purposes of CAFRA are concerned) does not answer the question whether the present rules and regulations do so. We hold that they do not.

Ironically, deference to the whole scheme of specific provisions and general use policies adopted by the DEP counsels against deference to the DEP's wishes in this action. For one thing, the regulations specifically defining "dwelling units or equivalent" do not include cabanas, bathhouses, or beach clubs among those structures equivalent to dwelling units. *N.J.A.C.* 7:7–2.1(b)(4)(v). For another, the regulations declaring the DEP's general use policies state that "[r]esort/recreation uses [including "recreational structures such as bathhouses"] shall have priority over all other uses [such as housing, industrial, and commercial uses]." *N.J.A.C.* 7:7E–7.3(b)(1)(ii). Luxury cabanas, even conceding that they differ greatly from traditional cabanas, are more akin to recreational structures such as bath houses than to residential structures such as housing developments or dwelling units. We do not wish to imply that recreational uses and residential uses are mutually exclusive. But we note that the DEP itself has carried over this bifurcation of uses into its specific definition of structures that are the equivalent of traditional dwelling units—it differentiates floating homes "designed or intended primarily as a permanent or seasonal dwelling" from those designed or intended for use as a "recreational vessel." The analogous distinction in the present context would be between residential structures such as campsites or mobile home sites and recreational structures such as bathhouses.

Furthermore, the statute and the regulations read together are confusing and misleading. The statute's language is so general as not to put the clubs on notice that the DEP, in defiance of common usage, might deem cabanas to come within "dwelling units or equivalent." And the regulation's definition of "dwelling unit or equivalent" was so specific as to imply to them that the inclusion of many structures meant the exclusion of others.

Additionally, the clubs' prior dealings with the DEP gave them no clue that the cabanas they were in the process of reconstructing would be considered facilities within the purview of CAFRA. DEP urges that an administrative agency's interpretation of a statute that it is charged with implementing should be given deference by the courts, if its interpretation is reasonable. This is true enough, but this maxim would have greater force were this a case of an agency's longstanding interpretation of the statute, as opposed to its first application of a statute (and its implementing regulation) to a new situation. This is the first time that DEP has attempted to apply CAFRA to cabanas. Granted, deluxe cabanas are unlike traditional cabanas on the Jersey Shore, as the Chancery Division observed. But the fact that they are not the same as bath houses does not make them the equivalent of dwelling units. The change was not so fundamental as to put beach clubs like Driftwood and Edgewater on notice that DEP would regard them as "housing developments"—especially not when the DEP had not applied CAFRA to the Tradewinds Beach Club, Deal Casino, and West End Towers, and moreover, when the DEP had approved both clubs' sewer extension permits without mentioning the applicability of CAFRA.

Neither the statute nor the regulations explicitly includes beach club cabanas as a "new housing development of 25 or more dwelling units or equivalent." Indeed the specificity of DEP's regulations supports the club's contention that it could not reasonably or fairly anticipate that DEP would change its

position and find that certain still undefined "deluxe beach club cabanas" were subject to CAFRA. In fact, for DEP to do so would go against its own regulatory scheme. The clubs planned their reconstruction in good faith reliance on the absence of any previous attempt by DEP to regulate beach club cabanas. By the time DEP first warned them of its new "deluxe cabana" policy, each club had demolished many of their old cabanas and had completed major portions of their renovation projects at substantial costs. At that advanced stage of project construction, given all the previously mentioned considerations, it would be fundamentally unfair for DEP to apply CAFRA to these particular cabanas.[2]

## IV

Finally, given this course of dealings, we hold that in order to subject beach club cabanas to its authority, DEP must proceed through the rulemaking process rather than through *ad hoc* adjudication. It is well-established that an agency has

---

[2]Any administrative agency in determining how best to effectuate public policy is also limited by applying principles of fundamental fairness. We have in the past applied such principles of fundamental fairness beyond those required by the Constitution, to administrative agency actions. *See In re Arndt,* 67 *N.J.* 432 (1975); *Monks v. New Jersey State Parole Bd.,* 58 *N.J.* 238 (1971). "When specific parties are particularly affected by a proposed rule, fair play and administrative due process dictate that an agency must conscientiously concern itself with and make reasonable efforts to accommodate the rights and interests of the affected individual and genuinely account for the individualized effect of its proposed action." *Bally Mfg. Corp. v. New Jersey Casino Control Comm'n, supra,* 85 *N.J.* 25, 345 (1981) (Handler, J., concurring).

"[T]here are no simple answers as to what constitutes fundamental fairness" and "[e]ach case must be considered and evaluated on its own merits." *In re Kallen, supra,* 92 *N.J.* 14, 27 (1983). The determination of whether agencies have observed principles of basic fairness therefore requires "an examination of the facts in each case, giving weight to the effect of the decision on the agency's public policy." *Id.* at 26.

However, we do not base this opinion solely on the principle of fundamental fairness to the defendants because of our strong belief that it would likewise be unfair to assert this undefined standard on other beach clubs in New Jersey contemplating improvements to their facilities.

discretion to exercise its statutory authority either by adjudication or rulemaking, and that agencies enjoy a great deal of flexibility in selecting the proceedings most likely to achieve their regulatory aims. *Securities and Exch. Comm'n v. Chenery Corp.*, 332 *U.S.* 194, 202–03, 67 *S.Ct.* 1575, 1580–81, 91 *L.Ed.* 1995, 2002 (1947); *Department of Labor v. Titan Constr. Co.*, 102 *N.J.* 1, 13 (1985); *Metromedia, Inc. v. Director, Div. of Taxation*, 97 *N.J.* 313 (1984); *Crema v. New Jersey Dep't of Envtl. Protection*, 94 *N.J.* 286, 299 (1983); *Bally Mfg. Corp. v. New Jersey Casino Control Comm'n*, 85 *N.J.* 325, 338 (1982) (Handler, J., concurring). Nevertheless, the discretion in the administrative agency between rulemaking and adjudication has limits. *Crema, supra,* 94 *N.J.* at 299.

In *Metromedia,* we synthesized from our prior decisions the relevant features of administrative rules that, if present, favor the adoption of the rulemaking process over *ad hoc* adjudication:

> Such a conclusion would be warranted if it appears that the agency determination, in many or most of the following circumstances, (1) is intended to have wide coverage encompassing a large segment of the regulated or general public, rather than an individual or a narrow select group; (2) is intended to be applied generally and uniformly to all similarly situated persons; (3) is designed to operate only in future cases, that is, prospectively; (4) prescribes a legal standard or directive that is not otherwise expressly provided by or clearly and obviously inferable from the enabling statutory authorization; (5) reflects an administrative policy that (i) was not previously expressed in any official and explicit agency determination, adjudication or rule, or (ii) constitutes a material and significant change from a clear past agency position on the identical subject matter; and (6) reflects a decision on administrative regulatory policy in the nature of the interpretation of law or general policy. These relevant factors can, either singly or in combination, determine in a given case whether the essential agency action must be rendered through rule-making or adjudication. [97 *N.J.* at 331–32.]

Applying the *Metromedia* standards to this case, we are satisfied that DEP's regulation of beach club cabanas is not valid without an authorizing rule or regulation. Here, DEP's regulation of beach club cabanas is not supported by a plain reading of CAFRA or the DEP regulations. Further, DEP has not previously regulated cabanas and still does not intend to

regulate all cabanas, only what it determines to be "deluxe" cabanas. The determination to regulate these beach club cabanas therefore constitutes a material and significant change from DEP's past policy on identical subject matter, thus satisfying *Metromedia* guidelines Nos. (4) and (5).

DEP alleges that rulemaking is not necessary here because "[t]he ruling is limited to the actual parties and the actual projects involved. In fact, such a declaratory ruling would be inadequate to bind any other proposed deluxe cabanas projects and the public at large." We disagree with this narrow interpretation of the DEP's power. To be sure, this ruling has an immediate effect only on these beach clubs. But if, as DEP contends and as we hold, DEP has implied statutory authority to regulate certain beach club cabanas, then its ruling in this case would apply to all other beach clubs contemplating constructing or renovating cabanas, thus falling within *Metromedia* guidelines Nos. (1), (2) and (3).

Moreover, to allow DEP's *ad hoc* determination as to these clubs to serve as sufficient notice of its changed position on beach club cabanas imposes an unfair burden on other beach clubs—particularly where, as here, DEP's decision lacks standards by which other beach clubs could determine whether they are subject to regulation. The lack of any specific standard results in confusion to the public and to DEP. Promulgating a regulation through rulemaking will aid not only beach club owners but also DEP in formulating guidelines for its own inspectors to determine whether a cabana is "deluxe enough" to be subject to DEP regulations.

## V

In conclusion, we hold that DEP has statutory authority to interpret "housing developments of 25 or more dwelling units or equivalent" to include beach club cabanas, but that it has not done so in its regulations. If DEP wishes to subject cabanas to its authority, it must do so through rulemaking. For DEP to

do so through *ad hoc* adjudication in this case would be fundamentally unfair and would violate due process under the principles we have expressed in *Crema, Metromedia,* and *Titan.* Accordingly, the actions taken by DEP against Driftwood and Edgewater are invalid and the judgment of the Appellate Division is reversed.

HANDLER, J., dissenting.

In these consolidated appeals, each of the appellants has embarked upon the construction of substantial, luxury cabana developments directly on the beachfront. The developments have the obvious potential for impacting drastically upon sensitive land areas within the regulatory concerns of the Department of Environmental Protection (DEP) as reflected in the comprehensive Coastal Area Facility Review Act (CAFRA). *N.J.S.A.* 13:19–1 to –21. Upon discovering these developments in progress, DEP promptly sought to have each of the developers submit applications and proceed under CAFRA regulations. They refused and continued construction with full knowledge that DEP considered the improvements to be subject to CAFRA. Litigation of the matter vindicated DEP's position in the Appellate Division. The Court now reverses that result—not because these extensive cabana developments are not subject to CAFRA but for the reason that DEP did not earlier adopt a specific rule that expressly designated cabanas as such to be included under the CAFRA statute and regulations.

I can understand the majority's perception that the adoption of a such an express rule clearly and explicitly including cabanas within the coverage of existing CAFRA regulations would have been appropriate. I cannot share its conclusion, however, that the absence of such an explicit rule is fatal to the action taken by the DEP in this case. The judicial proceedings that resulted in an adjudication of coverage were completely fair to the parties, giving them ample notice and opportunity to challenge the DEP's position and to defend their own interests. I therefore dissent.

As pointed out by the Court, M.J. Stavola t/a Driftwood Cabana Club (Driftwood) embarked upon an extensive development replacing 483 changing lockers and 35 cabanas with 134 luxury cabanas. Each cabana is between 300–400 square feet in area with full bath, dressing area, parlor, wet bar, electrical outlets, and deck. Similarly, Edgewater Beach, Inc. (Edgewater) embarked upon the building of 100 new luxury cabanas, replacing a complex of 300 lockers and 50 cabanas. Each new cabana interior will measure 10 feet by 16 feet and include a full bath, parlor, wet bar, electrical outlets, phone jacks, and will be extended by a 10-foot deck overlooking the pool or beach. Both developments are on the beachfront.

DEP discovered the Driftwood construction in April 1985. Based on that inspection, and on review of DEP records showing no CAFRA permit nor a determination of the inapplicability of CAFRA, the Bureau of Coastal Enforcement and Field Services issued a cease and desist letter to Driftwood, requiring Driftwood either to apply for a CAFRA permit or to stop construction and restore the property to its former condition. Driftwood elected to ignore the stop order and continued construction. The Edgewater construction was also discovered in April 1985. A similar cease and desist notice was sent to Edgewater, which chose to disregard it.

DEP was unsuccessful in the Chancery Division, which found that these cabanas were not equivalent to "dwelling units" within the contemplation of CAFRA. The Appellate Division, however, reversed and remanded to DEP. 206 *N.J.Super.* 213 (1985). The majority found the cabanas were not ordinary bathhouses suitable for changing clothes and resting, but were built for living in for a large part of the day, and thus were equivalent to dwelling units irrespective of whether overnight sleeping is permissible. *Id.* at 223.

The Court, in reversing the Appellate Division, takes a hyper-technical view of administrative law making, failing to consider the need for procedural flexibility and wide discretion vested in

administrative agencies to determine sensible modes of regulation. The regulatory discretion accorded administrative agencies in their selection and adaptation of procedures to effectuate their jurisdictional responsibilities has long been acknowledged. *See Securities and Exch. Comm'n v. Chenery Corp.*, 332 *U.S.* 194, 202–03, 67 *S.Ct.* 1575, 1580, 91 *L.Ed.* 1995, 2002 (1947) (Chenery II); *see also In re Uniform Administrative Procedural Rules*, 90 *N.J.* 85, 92 (1982) (a high degree of discretion in exercising procedural choice reposes in the administrative agency).

The procedural latitude accorded administrative agencies is bounded roughly by those considerations that are relevant in determining whether regulatory action should take the form of an administrative rule or an administrative adjudication. There are a variety of procedural choices and forms of regulatory action that occupy the large area between these outer bounds of administrative discretion.

On one end of the regulatory spectrum lies administrative rule-making. It is generally required or appropriate when an agency determination is intended to be applied prospectively, as a general standard or expression of administrative policy with widespread coverage and continuing effect; when agency action is concerned with "broad policy issues" that affect a large segment of the regulated or general public, rule-making as such is implicated. Similarly, an agency action that effects a material change in existing law is a proper subject for rule-making. *See Metromedia, supra,* 97 *N.J.* at 330; *Crema v. New Jersey Dep't of Envtl. Protection,* 94 *N.J.* 286, 302 (1983); Davis, Administrative Law Treatise § 7:25 at 186 (2d ed. Supp.1982). Agency determinations of this kind should ordinarily be enunciated as an administrative rule. *Metromedia,* 97 *N.J.* 313, 330 (1984); *Crema, supra,* 94 *N.J.* at 301–02; *see also N.J.S.A.* 52:14B–2(e) (an agency action or determination that implements or interprets law or policy can constitute an administrative rule). Furthermore, where the agency action concentrates upon concerns that transcend those of the individual litigants

and implicates matters of general administrative policy, rule-making procedures are deemed appropriate and should be invoked. *See Metromedia, supra,* 97 *N.J.* at 330–31; *Dougherty v. Department of Human Servs.,* 91 *N.J.* 1 (1982); *Texter v. Department of Human Servs.,* 88 *N.J.* 376 (1982). In these varied settings, a major premise underlying rule-making as the preferred regulatory mode is the need for adequate fact-finding fully to inform a decision with wide-ranging implications.

The fact-finding process that characterizes rule-making is much more flexible and expansive than that governing administrative adjudication, which is quasi-judicial in character and lies at the other pole of administrative regulation. Agency adjudication is appropriate when essentially only the interests of a particular individual or entity are immediately or directly affected by the anticipated determination and individualized fact-finding is relevant to the ultimate determination. The appropriateness of adjudication obtains notwithstanding the fact that an adjudicative decision will, as applied prospectively, exert precedential control or influence over other parties whose particular situations are covered by that embraced by the decision. *See Metromedia, Inc. v. Director, Div. of Taxation, supra,* 97 *N.J.* at 328; *Crema, supra,* 94 *N.J.* 296. In addition, if an agency determination is one that is expressly authorized by or obviously inferable from the specific language of the enabling statute, in effect calling for only the application of a clear standard to particular facts, it can be expressed through an adjudication and need not take the form of a formal rule or regulation. *E.g. Airwork v. Director, Div. of Taxation,* 97 *N.J.* 290 (1984) (where tax statute is sufficiently specific, determination in the form of a tax assessment does not require antecedent rule); *R.H. Macy & Co., Inc. v. Director, Div. of Taxation,* 41 *N.J.* 3 (1963) (when adequate legislative standard exists for administrative guidance, general rule is not required).

In many cases it is difficult to conclude with complete confidence whether the agency determination is one that should take the form of a rule or an adjudication. There is no catechism

that mandates agency action be one or the other in any given situation. Frequently the regulatory challenge cannot be categorized as involving only either broad policy issues or individual interests; and the agency action and determination addressed to that challenge may be a hybrid, partaking of elements from both the rule-making and adjudicatory modes. *See Metromedia, supra,* 97 *N.J.* at 332; *Bally Mfg. Corp. v. New Jersey Casino Control Comm'n,* 85 *N.J.* 325, 341–43 (1981) (concurring opinion) (procedures for "specific rule-making," rule-making may be appropriate even when proposed rule has special impact upon particular parties as well as the public).

The selection of an appropriate procedural mode, as between rule-making or adjudication or some other procedural combination, should be governed not only by the form or effect of the final determination, such as the number of persons affected or its retroactive or prospective effect or the kinds of factual matters that must be determined and resolved. The choice ultimately should turn on which procedure is best tailored to achieve the goals and fulfill the responsibilities of the agency in the given case. *See N.J.A.C.* 1:11–1.6(a)(3); *Bally Mfg. Corp. v. New Jersey Casino Control Comm'n, supra,* 85 *N.J.* 325, 341 (1981) (concurring opinion). The selection of a procedural format and the formulation of a suitable determination—be it adjudication or rule-making or some variant—must be responsive to the overall agency purpose and function in the context of the particular case subject of course to the general judicial and legislative guidelines governing administrative agency proceedings. *Ibid.*

These guidelines recognize the important authority and breadth of discretion that are necessarily reposed in administrative agencies in fulfilling their regulatory responsibilities. The procedural choices as between adjudication and rule-making are aspects of that delegated authority and lie within the discretion of administrative agencies. *Bally Mfg. Corp. v. New Jersey Casino Control Comm'n, supra,* 85 *N.J.* at 339. These considerations therefore strongly counsel judicial deference to

the administrative choice between adjudication and rule making.

In this case, the DEP is entitled to certain deference with respect to its interpretation of the statute, which it is charged by the Legislature with enforcing. *Peper v. Princeton Univ. Bd. of Trustees*, 77 *N.J.* 55, 69–70 (1978); *Honachefsky v. New Jersey Civil Service Comm'n*, 174 *N.J.Super.* 539, 542 (App. Div.1980). Its procedural choice in enforcing the statute also ought to be respected. The Appellate Division, with this Court's endorsement, correctly found that the rule-making authority granted to DEP, coupled with the admonition of CAFRA that it is to be liberally construed (*N.J.S.A.* 13:19–20), requires the conclusion that "dwellings or their equivalent" as presently expressed in the agency's regulations is sufficiently broad to include the type and number of luxury cabanas constructed here. 206 *N.J.Super.* at 222.

Under CAFRA, a facility would include any improvement designed or used for public facilities and housing, new housing developments of 25 or more dwellings units or equivalent, or expansion of existing developments by the addition of 25 or more dwelling units or equivalent. *N.J.S.A.* 13:19–3c(5). Similarly, *N.J.A.C.* 7:7–2.1(a), the regulation adopted pursuant to CAFRA, restates the definitions set out in *N.J.S.A.* 13:19–3c(5). *N.J.A.C.* 7:7–2.1(b) provides that the Department interpret the statutory term "facility" in its broadest sense as to provide adequate environmental safeguards for the construction of any facility in the coastal area. DEP is authorized under the Act to adopt regulations to effect the purposes of the Act, including the regulation of "facilities." *N.J.S.A.* 13:19–17. CAFRA also provides that "[t]his act shall be liberally construed to effectuate the purpose and intent thereof." *N.J.S.A.* 13:19–20.

In the case before us, I cannot within this frame of reference stigmatize the actions of DEP as arbitrary, unfounded, or unauthorized. DEP, upon discovering a situation clearly within the confines of its statutory responsibility, moved quickly,

investigating the developments while they were still under construction. Upon ascertaining the facts and concluding that its regulatory jurisdiction encompassed these developments, DEP issued a cease and desist notice to both developers, requiring them either to apply for a CAFRA permit or stop construction and restore the property to its former condition. DEP's determination entailed the application of reasonably clear statutory and regulatory standards to particular facts. Moreover, the parties were given full opportunity to test this position on the merits. There is no unfairness, abrupt or arbitrary administrative intermeddling, or oppressive agency conduct. The developers, with clear and prompt notice that the projects were subject to CAFRA, simply chose to ignore the legislative and administrative interdiction and continued construction at their own risk.

The absence of a more precise rule in this case is not fatal because application of CAFRA to these cabanas could be fairly anticipated under expressed DEP policy. As noted earlier, the cabanas create environmental impacts substantially similar to traditional housing facilities. Moreover, the actions here do not constitute material changes in existing law and cannot properly be regarded as *ultra vires* or *de facto* rule-making. These factors combined with the prompt action of the DEP in informing Stavola and Edgewater that the cabanas were subject to CAFRA demonstrate an absence of prejudicial surprise. Accordingly, DEP should have the authority under *N.J.S.A.* 13:1D–9 to enforce the State's environmental statutes, rules, and regulations.

For these reasons I would affirm the judgment of the Appellate Division.

*For reversal*—Chief Justice WILENTZ, and Justices CLIF-FORD, POLLOCK, GARIBALDI and STEIN—5.

*Affirmed*—1.

*Not participating*—1.