SYLLABUS

This syllabus is not part of the Court's opinion. It has been prepared by the Office of the Clerk for the convenience of the reader. It has been neither reviewed nor approved by the Court and may not summarize all portions of the opinion.

**In Re Appeal of the New Jersey Department of Environmental Protection's September 6, 2022 Denial of Request for Adjudicatory Hearing** (A-42-23) (089182)

**Argued October 22, 2024 -- Decided April 7, 2025**

**HOFFMAN, J., writing for a unanimous Court.**

In this appeal, the Court considers whether the Department of Environmental Protection's (DEP) grant of a waiver suspending certain environmental remediation obligations creates a constitutionally protected property interest in that waiver.

The Industrial Site Recovery Act (ISRA) prohibits the owner of an industrial establishment from transferring ownership until certain conditions are met, unless the owner pursues one of the alternatives that ISRA provides. As relevant here, one of the listed exceptions, N.J.S.A. 13:1K-11.5, provides for an "[a]pplication for closing [or] transfer when remediation is already in progress." Under that provision, an entity may apply to the DEP for a Remediation in Progress Waiver (RIP Waiver), which allows that entity to proceed with a triggering event (i.e., sale or cessation of operations) without the typical attendant ISRA requirements "if the industrial establishment is already in the process of a remediation." N.J.S.A. 13:1K-11.5(a). To receive a RIP Waiver, an entity must submit evidence "that the property . . . is being remediated by a prior owner or operator" and that a compliant "remediation funding source" (RFS) has been created. N.J.A.C. 7:26B-5.4(c).

In 2006, the corporate predecessor of Clarios, LLC, purchased an industrial site ("the Site"), for which the seller had executed a remediation plan under ISRA and placed funds in trust for future remediation ("the RFS Trust"). In 2007, Clarios ceased operations, triggering its ISRA responsibilities. Clarios, therefore, sought a RIP Waiver. In March 2007, the DEP granted Clarios's RIP Waiver but expressly reserved the right to enforce Clarios's ISRA obligations in the future, informing Clarios that the DEP "continues to reserve all rights to pursue appropriate enforcement actions allowable under the law for violations of ISRA."

In August 2011, Clarios sold the Site. In 2016, the purchaser of the Site filed for bankruptcy. In July 2021, the purchaser certified that the estimated cost to complete remediation was $563,000 but that the RFS Trust was fully depleted. The purchaser thereafter also missed its February 2022 deadline for completing

1

remediation of the Site. In April 2022, the DEP rescinded Clarios's RIP Waiver because remediation of the Site was no longer in progress, the RFS Trust was depleted, and the Site was out of compliance.

Clarios requested an adjudicatory hearing before the DEP, arguing that the DEP's rescission of the RIP Waiver without notice or an opportunity to be heard violated its due process rights. The DEP denied the request, stating that rescission of a RIP Waiver does not entitle Clarios to request an adjudicatory hearing pursuant to N.J.A.C. 7:26C-9.10(a) and that rescission does not constitute a contested case requiring a hearing under the Administrative Procedure Act.

Clarios appealed that decision. The Appellate Division ruled in favor of the DEP, holding that Clarios did not have a protected property interest in the RIP Waiver. 477 N.J. Super. 618, 628-29 (App. Div. 2024). The Court granted certification. 258 N.J. 55 (2024).

**HELD:** The DEP's initial grant of the waiver did not create a property interest in the continued suspension of Clarios's remediation obligations. Neither the controlling statutes and regulations nor a mutually explicit understanding between the parties provided an entitlement to the indefinite continuance of the waiver; to the contrary, the governing laws and agency materials all anticipate the DEP's ability to enforce remediation obligations in the future.

1. The chief ingredient in a property interest protected by the due process clause is a legitimate claim of entitlement, and an express statutory or regulatory grant is the clearest and strongest proof of an entitlement. One indication that a statute or regulation creates a protected property interest is through limitations placed on agency decision-making with respect to an alleged benefit. If the decisionmaker is not required to base its decisions on objective and defined criteria, but instead can deny the requested relief for any constitutionally permissible reason or for no reason at all, the State has not created a constitutionally protected interest. And a mere subjective expectancy is not sufficient to establish a protected interest. If an entitlement is not granted and secured through explicit language or limitations on discretion, it may be derived from mutually explicit understandings. But for an "understanding" to give rise to a property interest, the party asserting an entitlement must establish that both parties mutually recognized the existence of an entitlement. When an agency has broad discretion to grant, deny, or remove a purported benefit, there is also not likely to be a mutually explicit understanding of an entitlement. (pp. 14-19)

2. Here, the question is whether Clarios was entitled to the RIP Waiver in April 2022, when the rescission letter was sent. Looking to the language of the relevant statutes and regulations to answer the operative question, the Court finds no such

indication of an express statutory grant of entitlement in the indefinite continuation of the RIP Waiver at the time of rescission. ISRA provides no guidance on how the DEP should exercise its discretion in enforcing remediation obligations once a property falls out of compliance. And, unlike the statute at issue in Cleveland Board of Education v. Loudermill, 470 U.S. 532 (1985), ISRA does not guarantee Clarios continued viability of the RIP Waiver, regardless of the Site's compliance status. Nor is there any indication of such an entitlement in ISRA's implementing regulations. To the contrary, ISRA's implementing regulations expressly state that the DEP retains discretionary authority to rescind a RIP Waiver. N.J.A.C. 7:26B-1.8(b). And N.J.A.C. 7:26B-5.4 governs the requirements for receiving and maintaining a RIP Waiver while remediation is "in progress." ISRA's implementing regulations thus make clear that the recipient of a RIP Waiver would not be exempt from future remediation obligations if the relevant industrial property were to fall out of compliance -- as it did here. As the Supreme Court found in Board of Regents v. Roth, 408 U.S. 564, 567 (1972), there simply is no entitlement if the decision, as it was here, is left to the "unfettered discretion" of the State. (pp. 19-23)

3. Clarios also has failed to demonstrate that an extra-statutory or extra-regulatory understanding existed that would support its claim of entitlement. Clarios alleges that such an understanding was evidenced by silence during the fifteen years that the DEP did not enforce Clarios's residual remediation obligations. But an "understanding" capable of establishing a property interest cannot exist when, as here, the government has ample discretion to deny or withdraw the benefit in question. Furthermore, the DEP was not completely silent. In January 2021, the DEP informed Clarios that, if the entity to which Clarios sold the Site "fails to maintain the RFS, then the RIP Waiver may no longer be considered in effect and [Clarios] would also be obligated to post RFS and/or remediate the site pursuant to ISRA." When Clarios sold the Site in 2011, it took specific measures to protect itself legally and financially from potential future remediation obligations. Those measures conflict with its argument that, at the same time, Clarios was relying upon an entitlement to the indefinite continuation of the RIP Waiver. (pp. 23-26)

4. Here, Clarios had no protected property interest in the indefinite continuation of the RIP Waiver, and rescission of the RIP Waiver without a hearing was therefore not a deprivation of Clarios's due process rights. Moreover, even if Clarios had a protected property interest in the RIP Waiver in 2022, Clarios failed to allege sufficient material adjudicative facts that would mandate a hearing. (pp. 26-28)

    **AFFIRMED.**

**CHIEF JUSTICE RABNER and JUSTICES PIERRE-LOUIS, WAINER APTER, FASCIALE, and NORIEGA join in JUSTICE HOFFMAN's opinion. JUSTICE PATTERSON did not participate.**

3

SUPREME COURT OF NEW JERSEY

A-42 September Term 2023

089182

In Re Appeal of the New Jersey Department
of Environmental Protection's September 6, 2022
Denial of Request for Adjudicatory Hearing Under
N.J.A.C. 7:26C-9.10, Dated May 12, 2022,
Concerning the Department's April 20, 2022
Notice of Remediation in Progress Waiver Rescission.

On certification to the Superior Court,
Appellate Division, whose opinion is reported at
477 N.J. Super. 618 (App. Div. 2024).

Argued
October 22, 2024

Decided
April 7, 2025

Roy D. Prather, III, argued the cause for appellant
Clarios, LLC (Beveridge & Diamond, attorneys; Roy D.
Prather, III, on the briefs).

Bethanne S. Prugh, Deputy Attorney General, argued the
cause for respondent New Jersey Department of
Environmental Protection (Matthew J. Platkin, Attorney
General, attorney; Jeremy M. Feigenbaum, Solicitor
General, and Sookie Bae-Park, Assistant Attorney
General, of counsel, and Bethanne S. Prugh and
Nathaniel I. Levy, Deputy Attorneys General, on the
briefs).

Michael S. Kettler argued the cause for intervenor 760
New Brunswick Urban Renewal Limited Liability
Company (Riker Danzig, attorneys; Steven T. Senior, of
counsel and on the briefs, and Michael S. Kettler, on the
briefs).

At issue in this case is whether the Department of Environmental Protection's (DEP) grant of a waiver suspending certain environmental remediation obligations creates a constitutionally protected property interest in that waiver. Clarios, LLC (Clarios), argues that it does and that the DEP therefore violated Clarios's due process rights when it rescinded, without notice or an opportunity for a hearing, the waiver it had issued for a property Clarios previously owned.

We hold that the DEP's initial grant of the waiver did not create a property interest in the continued suspension of Clarios's remediation obligations. Neither the controlling statutes and regulations nor a mutually explicit understanding between the parties provided an entitlement to the indefinite continuance of the waiver; to the contrary, the governing laws and agency materials all anticipate the DEP's ability to enforce remediation obligations in the future. We therefore affirm the judgment of the Appellate Division, which found no constitutionally protected property interest in the waiver.

I.

We begin by reviewing the statutory and regulatory framework that governs remediation of industrial sites.

In 1983, New Jersey passed the Environmental Cleanup Responsibility Act (ECRA), which was designed to comprehensively address industrial contamination. See L. 1983, c. 330 (codified at N.J.S.A. 13:1K-6 to -13). ECRA's unique approach to remediation "was the first to tie events in the real estate and business world to government sanctioned and monitored environmental audits and cleanups." David B. Farer, ECRA Verdict: The Successes and Failures of the Premiere Transaction-Triggered Environmental Law, 5 Pace Env't L. Rev. 113, 113 (1987). That approach "differentiated [ECRA] from other cleanup statutes, which are triggered by discharge of hazardous substances or by the determination of an environmental agency." Diana R. D'Alonzo et al., ECRA to ISRA: Is it More Than Just a Name Change?, 7 Vill. Env't L.J. 51, 53 (1996). Despite the Legislature's efforts in this regard, ECRA "was not well received by business and industry." Id. at 51. "For all of its ingenuity in concept, the execution [of ECRA was seen as] incompletely realized, imprecise and confusing." Farer, 5 Pace Env't L. Rev. at 117.

In 1993, the Legislature enacted the Industrial Site Recovery Act (ISRA), which "amend[ed] and supplement[ed]" ECRA. See L. 1993, c. 139. ISRA embodied the Legislature's evolved understanding of "the extent of the State's industrial contamination and the cost and complexity of remediations" in the ten years since ECRA's enactment. N.J.S.A. 13:1K-7. Accordingly, "ISRA reflects the compromise that while someone must pay for the cost of cleanup, the legislature will work with businesses to find less burdensome methods of funding." D'Alonzo et al., 7 Vill. Env't L.J. at 77. As a result, "New Jersey's business and industrial communities . . . favor ISRA's economic aspects." Id. at 75.

ISRA applies to industrial establishments as defined in N.J.S.A. 13:1K-8 and N.J.A.C. 7:26B-1.4 and provides for remediation projects to proceed in multiple stages, "in accordance with criteria, procedures, and time schedules established by the [DEP]." N.J.S.A. 13:1K-9(b)(1). And ISRA permits the DEP to order further remediation when necessary, up through "the issuance of a no further action letter." Id. at (l).

ISRA's requirements are triggered when the owner or operator of an industrial establishment seeks to sell the property or cease operations. For instance, ISRA prohibits the owner of an industrial establishment from

4

transferring ownership until certain conditions are met, unless the owner pursues one of the alternatives that ISRA provides:

> Except as otherwise provided in [N.J.S.A. 13:1K-11] and [N.J.S.A. 13:1K-11.2, .5, .6, and .7], the owner or operator of an industrial establishment shall not transfer ownership or operations until a negative declaration or a remedial action workplan has been approved by the department, a remedial action workplan has been prepared and certified by a licensed site remediation professional and submitted to the department, or the conditions of subsection e. of this section for remediation agreements or remediation certifications have been met and until, in cases where a remedial action workplan is required to be approved or a remediation agreement has been approved, a remediation funding source, as required pursuant to [N.J.S.A. 58:10B-3], has been established.
>
> [Id. at (c).]

As relevant here, one of the listed exceptions, N.J.S.A. 13:1K-11.5, provides for an "[a]pplication for closing [or] transfer when remediation is already in progress." Pursuant to that provision, an entity may apply to the DEP for a Remediation in Progress Waiver (RIP Waiver), which allows that entity to proceed with a triggering event (i.e., sale or cessation of operations) without the typical attendant ISRA requirements "if the industrial establishment is already in the process of a remediation." N.J.S.A. 13:1K-11.5(a). That statutory provision addresses the reality that, over the course of remediation, there can be multiple entities responsible for a particular

5

property, depending on the complexity of the remediation and the number of times the property has changed hands. As a result, it is possible that the entity actively conducting the remediation may not be the current owner or operator of the property.

The RIP Waiver provision illustrates the competing interests that ISRA seeks to balance. On the one hand, it is an example of new procedures "designed to guard against redundancy from the regulatory process." N.J.S.A. 13:1K-7. On the other hand, ISRA's implementing regulations make clear that a RIP Waiver "may not relieve the owner or operator or any person responsible for conducting the remediation of the industrial establishment[] of the obligations to remediate the industrial establishment." N.J.A.C. 7:26B-1.8(b).

To receive a RIP Waiver, an entity must submit an application that includes evidence "that the property . . . is being remediated by a prior owner or operator" and that a compliant "remediation funding source" (RFS) has been created. N.J.A.C. 7:26B-5.4(c). "Upon the submission of a complete application, and upon a finding that the information submitted is accurate, the [DEP] shall authorize . . . that the applicant may close operations or transfer ownership or operations of the industrial establishment." N.J.S.A. 13:1K-11.5(b). In other words, issuance of a RIP Waiver is contingent upon compliance with the statutory and regulatory remediation requirements.

6

II.

A.

This case involves a RIP Waiver issued in 2007 and rescinded in 2022.

In 2006, Delphi Automative Systems, LLC (Delphi), a car battery manufacturer, sold an industrial site located at 760 Jersey Avenue in New Brunswick ("the Site") to Johnson Controls Battery Group, Inc. (Johnson). As part of the sale, Delphi assumed responsibility for remediation of the Site and, accordingly, executed a remediation plan under ISRA and placed $1,829,600.37 in trust for future remediation ("the RFS Trust"). The Site then passed to Clarios, Johnson's corporate successor.

In 2007, Clarios ceased operations, triggering Clarios's ISRA responsibilities. Clarios, therefore, sought a RIP Waiver pursuant to N.J.A.C. 7:26B-5.4. On March 12, 2007, the DEP granted Clarios's RIP Waiver but expressly reserved the right to enforce Clarios's ISRA obligations in the future, informing Clarios that the RIP Waiver "shall not restrict or prohibit the [DEP] or any other agency from taking regulatory action under any other statute, rule or regulation" and that the DEP "continues to reserve all rights to pursue appropriate enforcement actions allowable under the law for violations of ISRA."

7

In August 2011, Clarios sold the Site to DeNovo New Brunswick, LLC (DeNovo). As part of the sale, Clarios paid $2.5 million for DeNovo to indemnify Clarios against subsequent remediation costs and for DeNovo to contract with Navigators Specialty Insurance Company for environmental liability insurance on behalf of Clarios. In October 2011, DeNovo conveyed ownership of the Site to its then-subsidiary, 760 New Brunswick Urban Renewal Limited Liability Company (Urban Renewal).[1] Later, in 2013, DeNovo assumed Delphi's remediation obligations for the Site, thereby gaining access to the RFS Trust, which had a remaining balance of $1,825,000.

In 2016, DeNovo filed for bankruptcy. At that time, the RFS Trust balance was $1,881,293.29. DeNovo continued to remediate using the available RFS Trust funds but did not further augment the RFS Trust. In March 2019, DeNovo missed a deadline to submit an investigation report to the DEP, which was required as part of the remediation process. On July 28, 2021, DeNovo certified that the estimated cost to complete remediation was

---

[1] In December 2011, DeNovo and another business entity created Urban Renewal as a joint venture to redevelop the Site. As part of that process, DeNovo transferred title of the Site to Urban Renewal. In 2015, DeNovo transferred its interest in Urban Renewal to a different business entity, which severed DeNovo's legal business relationship with Urban Renewal.

$563,000 but that the RFS Trust was fully depleted. DeNovo thereafter also missed its February 2022 deadline for completing remediation of the Site.

Meanwhile, in April 2020, DeNovo and Urban Renewal filed suit against Clarios in the United States District Court for the District of New Jersey. The suit asserted multiple claims, including that Clarios was liable under ISRA for remediation costs. In response to the suit, Clarios contacted the DEP in January 2021, requesting access to the RFS Trust, but the DEP denied the request because Clarios was not actively conducting the Site remediation. In denying the request, the DEP reminded Clarios that, pursuant to the RIP Waiver process, if DeNovo "fails to maintain the RFS, then the RIP Waiver may no longer be considered in effect and [Clarios] would also be obligated to post RFS and/or remediate the site pursuant to ISRA." In December 2021, the district court dismissed the ISRA claims against Clarios, concluding that, "unless further action is taken by [the DEP], [Clarios] has no obligation to remediate the Property under . . . ISRA."

On April 20, 2022, the DEP rescinded Clarios's RIP Waiver because DeNovo's remediation of the Site was no longer in progress, the RFS Trust was depleted, and the Site was out of compliance.

B.

On May 12, 2022, Clarios requested an adjudicatory hearing before the DEP, arguing that the DEP's rescission of the RIP Waiver without notice or an opportunity to be heard violated its due process rights. The DEP denied the request on September 6, 2022, stating that rescission of a RIP Waiver does not entitle Clarios to request an adjudicatory hearing pursuant to N.J.A.C. 7:26C-9.10(a) and that rescission does not constitute a contested case requiring a hearing under the Administrative Procedure Act, N.J.S.A. 52:14B-1 to -31.

Clarios appealed that decision. The DEP opposed the appeal and Urban Renewal intervened in opposition to the appeal.[2] The Appellate Division ruled in favor of the DEP, holding that Clarios did not have a protected property interest in the RIP Waiver. In re DEP Denial of Adjudicatory Hearing, 477 N.J. Super. 618, 628-29 (App. Div. 2024).

The appellate court stated that to have such an interest, a party must have both a benefit and legitimate claim of entitlement to that benefit. Id. at 626. The Appellate Division found that any benefit Clarios claimed or relied on during the fifteen years for which the remediation obligation remained

---

[2] After the parties finished briefing before the Appellate Division, the district court granted Urban Renewal's motion to file a supplemented complaint reasserting its ISRA claims against Clarios, and litigation has resumed in that federal case.

suspended was based solely on Clarios's "unilateral expectation that the prior remediation agreement would remain compliant," not "on any regulatory or statutory provisions." Id. at 628-29. Indeed, the court noted, any such expectation of continued suspension was undercut by the language of the relevant statutory and regulatory provisions and the 2007 RIP Waiver itself, which expressly informed Clarios that the DEP "continues to reserve all rights to pursue appropriate enforcement actions allowable under the law for violations of ISRA." Id. at 628. Accordingly, the court held that Clarios had "neither a legitimate claim to entitlement nor a property interest associated with that benefit." Id. at 629.

Clarios petitioned this Court for certification, which the DEP opposed; Urban Renewal, as the current owner of the Site, intervened in opposition. We granted certification. 258 N.J. 55 (2024).

III.

A.

Before this Court, Clarios argues that it was entitled to the RIP Waiver and that rescission of the RIP Waiver without notice and a hearing constituted a violation of Clarios's due process rights.

Clarios bases its assertion of entitlement on the ISRA provision, N.J.S.A. 13:1K-11.5, under which Clarios received the RIP Waiver in 2007,

11

contending that the RIP Waiver conferred the benefit of indefinite suspension of its remediation obligations. Clarios argues that the DEP's course of action and the lack of communications between the DEP and Clarios from 2007 to 2022 reflected a mutual understanding of Clarios's entitlement to a protected property interest in the RIP Waiver. Additionally, Clarios argues that it relied on that understanding when it sold the Site and during the district court litigation "with the expectation and understanding that Clarios' right in the RIP waiver was protected by due process."

B.

The DEP agrees with the Appellate Division that Clarios did not have a protected property interest in the RIP Waiver, that Clarios had no right to notice or a hearing regarding the RIP Waiver rescission, and that, accordingly, there was no due process violation. The DEP asserts that because the RIP Waiver did not provide an ongoing benefit to Clarios, there was no entitlement to any benefit. Additionally, the DEP contends that the purpose of the RIP Waiver rescission was to "essentially inform[] Clarios of where it stood in the queue of ISRA responsible parties next in line to remediate the [Site]." Thus, the DEP argues it rescinded Clarios's RIP Waiver not because it saw the RIP Waiver as an entitlement or a barrier to enforcement of Clarios's ISRA requirements, but rather to notify Clarios that it may soon be "called to task"

12

to fulfill its ISRA obligations.  The DEP notes that Clarios will have the opportunity to request a hearing if and when the DEP pursues enforcement of Clarios's ISRA obligations.

## C.

Urban Renewal argues that Clarios was not entitled to the RIP Waiver at the time of rescission because the underlying remediation was out of compliance.  Regardless of whether the DEP had discretion to grant Clarios's RIP Waiver in 2007, Urban Renewal argues that ISRA and its attendant regulations did not limit the DEP's discretion to rescind the RIP Waiver in 2022.  In addition to no limitation on discretion, Urban Renewal asserts that, because the DEP explicitly reserved the right to enforce Clarios's ISRA obligations when it granted the RIP Waiver, there was no mutual understanding between the parties.  Rather, Clarios merely had a unilateral expectation of an indefinite entitlement to the RIP Waiver.

## IV.

## A.

We review interpretations of laws, statutes, and rules de novo.  In re Ridgefield Park Bd. of Educ., 244 N.J. 1, 17 (2020).  This Court is "not bound to follow the trial court's or Appellate Division's interpretive legal conclusions, unless persuaded that those conclusions are correct."  State v.

13

Manning, 240 N.J. 308, 337 (2020) (applying de novo review to a Fourth Amendment claim); see also Ridgefield Park, 244 N.J. at 17 (when there is a constitutional concern, the Court applies de novo review).

B.

The Fourteenth Amendment to the Federal Constitution provides that no state may "deprive any person of life, liberty, or property, without due process of law." U.S. Const. amend. XIV, § 1. The "chief ingredient in a property interest protected by the due-process clause is a legitimate claim of entitlement," and, for our purposes, "[a]n entitlement is created and its dimensions are defined by state law." J.E. ex rel. G.E. v. State, 131 N.J. 552, 563-64 (1993).

Due process protection may extend to non-physical property. For instance, "a person may have a property interest in a 'benefit.'" Thomas Makuch, LLC v. Township of Jackson, 476 N.J. Super. 169, 185 (App. Div. 2023) (citing Bd. of Regents v. Roth, 408 U.S. 564, 577 (1972)). For a claimed entitlement to a benefit to be enforceable, such an entitlement "must be derived from statute or legal rule or through a mutually explicit understanding." Leis v. Flynt, 439 U.S. 438, 442 (1979).

"To examine a procedural due process claim, courts 'first assess whether a liberty or property interest has been interfered with by the State, and second,

14

whether the procedures attendant upon that deprivation are constitutionally sufficient.'" State v. Robinson, 229 N.J. 44, 75 (2017) (quoting Doe v. Poritz, 142 N.J. 1, 99 (1995)). The party asserting a constitutionally protected property interest bears the burden of establishing that such an interest exists. See, e.g., McKinney v. Univ. of Pittsburgh, 915 F.3d 956, 962 (3d Cir. 2019).

1.

An express statutory or regulatory grant is the clearest and strongest proof of an entitlement. See, e.g., Goss v. Lopez, 419 U.S. 565, 568 (1975) (looking first to the relevant statute and finding a clearly secured right to education for certain Ohio residents). In Cleveland Board of Education v. Loudermill, for example, the U.S. Supreme Court found such an explicit statutory creation of an entitlement in an Ohio statute's express provision that certain employees could not be removed from their positions except for enumerated reasons and, even then, must be given opportunities to appeal their removal. 470 U.S. 532, 538-39 (1985). The Supreme Court found that the Ohio statute "plainly supports the conclusion" that the employees were "entitled to retain their positions" and therefore "possessed property rights in continued employment." Id. at 539.

But the grant of a statutory or regulatory entitlement must be clear. The Supreme Court has noted that, if the claimant "was given a statutory

15

entitlement, we would expect to see some indication of that in the statute itself." Town of Castle Rock v. Gonzales, 545 U.S. 748, 765-66 (2005) (holding that "a personal entitlement to something as vague and novel as enforcement of restraining orders cannot 'simply g[o] without saying'" (quoting the dissent by Justice Stevens, id. at 788 n.16)).

One indication that a statute or regulation creates a protected property interest is through limitations placed on agency decision-making with respect to an alleged benefit. Thomas Makuch, LLC, 476 N.J. Super. at 185 (citing Gonzales, 545 U.S. at 756). An entitlement is more readily found when legislation or regulations "show 'that particularized standards or criteria guide the State's decisionmakers,'" Olim v. Wakinekona, 461 U.S. 238, 249 (1983) (quoting Conn. Bd. of Pardons v. Dumschat, 452 U.S. 458, 467 (1981) (Brennan, J., concurring)), or otherwise "substantively limit official discretion," Thomas Makuch, LLC, 476 N.J. Super. at 185. In contrast, "[i]f the decisionmaker is not 'required to base its decisions on objective and defined criteria,' but instead 'can deny the requested relief for any constitutionally permissible reason or for no reason at all,' the State has not created a constitutionally protected" interest. Olim, 461 U.S. at 249 (quoting Dumschat, 452 U.S. at 467 (Brennan, J., concurring)).

16

Moreover, certain interests themselves do not rise to the level of a constitutionally protected property interest. The Supreme Court, for example, has rejected a determination "that a mere subjective 'expectancy'" is sufficient to establish a protected interest. Perry v. Sindermann, 408 U.S. 593, 603 (1972) (quoting Sindermann v. Perry, 430 F.2d 939, 943 (5th Cir. 1970)).

2.

If an entitlement is not granted and secured through explicit language or limitations on discretion, it may be derived from "mutually explicit understandings." Id. at 601.

For an "understanding" to give rise to a property interest, it must consist of "more than an abstract need or desire" or "unilateral expectation." Roth, 408 U.S. at 577. Rather, the party asserting an entitlement must establish that both parties mutually recognized the existence of an entitlement. Leis, 439 U.S. at 441-43 ("reasonable expectations" are not enough to prove the "requisite mutual understanding" for an entitlement); see also McKinney, 915 F.3d at 960 ("The Supreme Court has set a high bar for how 'explicit' an understanding must be in order to support a property interest."); Tundo v. County of Passaic, 923 F.3d 283, 287 (3d Cir. 2019) ("Any understanding must be mutual: the government and the employee must both clearly expect that the employee has some entitlement to the benefit.").

17

The Supreme Court indicated how such an understanding might be created in Perry. In that case, a teacher alleged that, although the college had no explicit tenure system, there was an "understanding fostered by the college administration" of informal tenure that the teachers had relied upon to evidence a mutual understanding of entitlement to the property interest of continued employment. Perry, 408 U.S. at 599-600. The Court concluded that a "written contract with an explicit tenure provision clearly is evidence of a formal understanding," but that "absence of such an explicit contractual provision may not always foreclose the possibility of a property interest." Id. at 601. Other evidence -- such as "'words and conduct in the light of the surrounding circumstances,'" id. at 602 (quoting 3A Corbin on Contracts § 562 (1960)); the "'common law of a particular industry,'" ibid. (quoting United Steelworkers of Am. v. Warrior & Gulf Co., 363 U.S. 574, 579 (1960)); and "the policies and practices of the institution," id. at 603 (quoting Sindermann, 430 F.2d at 943) -- may establish the requisite "mutually explicit understanding" for an entitlement. Id. at 601.

However, just as the presence of substantial agency discretion can defeat a claim of entitlement based on statutory or regulatory language, so can it defeat an alleged entitlement based on mutual understanding: when an agency has broad discretion to grant, deny, or remove a purported benefit, there is also

18

not likely to be a mutually explicit understanding of an entitlement. See Tundo, 923 F.3d at 287 ("This discretion need not be absolute. It just has to be enough that there is no mutually explicit understanding that the benefit will continue.").

V.

Against this jurisprudential backdrop, we consider whether Clarios had an entitlement to the RIP Waiver.

As a preliminary matter, the determination of whether a claimant had a property interest focuses on the time that the purported interest was allegedly compromised. See, e.g., Goldberg v. Kelly, 397 U.S. 254, 264 (1970) (focusing questions of welfare eligibility and entitlement at the time payments stopped, not started); Roth, 408 U.S. at 567 (assessing entitlement to employment at the time of termination, not hiring). Thus, the question at hand is whether Clarios was entitled to the RIP Waiver on April 20, 2022, the date of the rescission letter.[3]

_____

[3] There is a valid debate regarding whether Clarios was receiving a benefit at all from the RIP Waiver at the time of rescission. Due process assessments usually focus on whether there is an entitlement to a purported benefit, rather than the existence of the benefit itself. See, e.g., Thomas Makuch, LLC, 476 N.J. Super. at 187 (evaluating whether placement on a towing list is a protected property interest without assessing whether being on the list is a benefit at all). We need not address whether the RIP Waiver provided Clarios

19

Our analysis is guided by the facts as they stood on that date: Urban Renewal owned the site; DeNovo had stopped remediating the Site; the RFS Trust balance was zero; the remaining estimated cost of remediation was $563,000; the DEP had declared the Site out of compliance; and the DEP had made Clarios aware that, if the RFS Trust was not adequately maintained, Clarios may be called to task to maintain a funding source and/or remediate the Site.

A.

As discussed above, we first look to the language of the relevant statutes and regulations to answer the operative question: whether ISRA granted Clarios an entitlement to a property interest in the RIP Waiver at the time of rescission.

Here, we find no such indication of an express statutory grant of entitlement in the indefinite continuation of the RIP Waiver at the time of rescission. ISRA provides for the issuance of RIP Waivers, N.J.S.A. 13:1K-11.5, but it provides no guidance on how the DEP should exercise its discretion in enforcing remediation obligations once a property falls out of

---

with a benefit because we ultimately hold that there is no entitlement to a purported benefit and, thus, there is no constitutionally protected property interest.

compliance. Unlike the statute in Loudermill, ISRA does not guarantee Clarios continued viability of the RIP Waiver, regardless of the Site's compliance status. Loudermill identified an entitlement within the four corners of the statute, see 470 U.S. at 538-59, where, according to Gonzales, see 545 U.S. at 765-66, we would expect to find it; here, we find no such language in ISRA.

Nor do we find any indication of such an entitlement in ISRA's implementing regulations. To the contrary, ISRA's implementing regulations expressly state that the DEP retains discretionary authority to rescind a RIP Waiver. N.J.A.C. 7:26B-1.8(b). The regulation, N.J.A.C. 7:26B-5.4, which is aptly titled "Remediation in progress waiver," governs the requirements for receiving and maintaining a RIP Waiver while remediation is "in progress" -- as it was here. ISRA's implementing regulations make clear that the recipient of a RIP Waiver would not be exempt from future remediation obligations if the relevant industrial property were to fall out of compliance -- as it did here.

Both parties in this case acknowledge that the plain language of the applicable regulation states that "issuance of [a RIP Waiver] may not relieve the owner or operator or any person responsible for conducting the remediation of the industrial establishment, of the obligations to remediate the industrial establishment pursuant to ISRA, this chapter and any other applicable law."

21

N.J.A.C. 7:26B-1.8(b) (emphasis added). That language does not secure a recipient's entitlement to a RIP Waiver once granted. Rather, it explicitly acknowledges the DEP's right to enforce a RIP Waiver recipient's ISRA obligations in the future, and it does so in a way that does not constrain the DEP's exercise of its discretionary authority, which, in this context, is unqualified and unlimited.

As the U.S. Supreme Court found in Roth, there simply is no entitlement if the decision, as it was here, is left to the "unfettered discretion" of the State. See 408 U.S. at 567. Indeed, Clarios was, in this way, similar to the professor in Roth, who was hired for a one-year position and then not renewed for the following year. Id. at 566. The Supreme Court noted that there was no "state statute or University rule or policy that secured [the professor's] interest in re-employment or that created any legitimate claim to it," id. at 578, leaving the Court to conclude that the legislative scheme "clearly leaves the decision . . . to the unfettered discretion of university officials," id. at 567. Consequently, the Court held that the professor "surely had an abstract concern in being rehired, but he did not have a property interest sufficient to require the University authorities to give him a hearing when they declined to renew his contract of employment." Id. at 578. Here, ISRA empowered the DEP with the discretion to manage RIP Waivers; thus, like the professor in Roth, Clarios

22

may have had an "abstract concern" about the continuation of the RIP Waiver, but Clarios did not have a legitimate claim of entitlement or a property interest.

Clarios concedes that discretion plays an important role in determining whether there is a legitimate claim of entitlement, noting that "New Jersey courts have aligned with the Supreme Court's finding that a lack of agency discretion is evidence that there is a legitimate claim of entitlement to the benefit." In an effort to overcome the lack of any express limitation on the DEP's discretion, Clarios argues that we should instead look back to the DEP's lack of discretion to initially grant the RIP Waiver in 2007 -- fifteen years before the DEP responded to the remediation failures.[4] Clarios's only argument in this regard reflects both its recognition of the significance of the DEP's discretionary authority and its inability to counter such authority in 2022.

## B.

Clarios also has failed to demonstrate that an extra-statutory or extra-regulatory understanding existed that would support its claim of entitlement.

---

[4] Clarios relied upon N.J.S.A. 13:1K-11.5, which states that the DEP "shall" grant a RIP Waiver to applicants that satisfy the listed requirements (including, in Clarios's case, that the Site remain in active remediation).

Clarios argues that its property interest in the RIP Waiver could be found in "understandings that secure certain benefits and that support claims of entitlement to those benefits" (quoting Roth, 408 U.S. at 577). In support, Clarios alleges that such an understanding was evidenced by silence during the fifteen years that the DEP did not enforce Clarios's residual remediation obligations. According to Clarios, the DEP's "silence toward Clarios in the ensuing years embodied the parties' understanding that [the DEP] would honor the suspension of Clarios' ISRA responsibility without arbitrary termination."

Initially, it bears noting that an "understanding" capable of establishing a property interest cannot exist when, as here, "the government has ample discretion" to deny or withdraw the benefit in question. Tundo, 923 F.3d at 287. Even "when the scope of the government's discretion is at best ambiguous, that is 'too slender a reed to support the weight of a constitutional right'" through a mutually explicit understanding. Id. at 288 (quoting McKinney, 915 F.3d at 963). As we discuss in detail above, when site remediation is no longer in progress, the DEP's discretion regarding RIP Waiver rescission is unfettered, countering any argument that a lack of discretion created a mutually explicit understanding that Clarios was entitled to the continuation of the RIP Waiver when the Site was no longer compliant with ISRA.

24

Likewise, the DEP's silence, which Clarios attributes to the absence of engagement between Clarios and the DEP while DeNovo was fulfilling its remediation obligations, simply does not satisfy the "high bar" that the Supreme Court has established in this context, see McKinney, 915 F.3d at 960, nor does it rise to the level of a "mutually explicit" understanding as discussed in Perry, 408 U.S. at 601.  Furthermore, the DEP was not completely silent.  In January 2021, the DEP informed Clarios that, if DeNovo "fails to maintain the RFS, then the RIP Waiver may no longer be considered in effect and [Clarios] would also be obligated to post RFS and/or remediate the site pursuant to ISRA."  Beyond that communication, the DEP had no reason to engage with Clarios while the Site was in compliance with ISRA and was actively being remediated by DeNovo.[5]

---

[5]  Additionally, Urban Renewal raises the argument that Clarios could not have an entitlement to the RIP Waiver because the viability of the RIP Waiver was entirely predicated on whether the remediation of the Site by DeNovo would continue and remain compliant with ISRA.  Relying on O'Bannon v. Town Court Nursing Center, 447 U.S. 773 (1980), Urban Renewal asserts that "[a] party does not have a legitimate claim of entitlement to a benefit conferred by the government, and thus does not have a Constitutionally protected property interest in retaining that benefit, where the government can revoke the benefit based on the conduct of a third-party over whom the party asserting the due process claim has no control."  We need not decide whether to apply O'Bannon in this context because we ultimately hold that Clarios has otherwise failed to prove a protected property interest in the RIP Waiver.

25

When Clarios sold the Site to DeNovo in 2011, Clarios took specific measures to protect itself legally and financially from potential future remediation obligations. As part of the sale, Clarios sought and obtained from DeNovo indemnification protection from any costs associated with the subsequent remediation of the Site. Clarios also sought and obtained from DeNovo an insurance policy on Clarios's behalf to spare Clarios from potential future environmental liability. Clarios's protective measures conflict with its argument that, at the same time, Clarios was relying upon an entitlement to the indefinite continuation of the RIP Waiver, or that the DEP's discretion in enforcing Clarios's remediation obligations was somehow circumscribed.

C.

In sum, we find that Clarios had no protected property interest in the indefinite continuation of the RIP Waiver. ISRA and its implementing regulations did not secure such an entitlement; in fact, they expressly contradict the grant of an entitlement. There are no relevant limitations on the DEP's discretion to rescind a RIP Waiver when a site is no longer ISRA-compliant; in fact, the DEP's discretion in this area is clear and broad. And there was no mutually explicit understanding clearly securing an entitlement; in fact, the limited communications between the parties contradict the

26

existence of an entitlement. Rescission of the RIP Waiver without a hearing was therefore not a deprivation of Clarios's due process rights.

We note by way of conclusion that even if Clarios had a protected property interest in the RIP Waiver in 2022, Clarios failed to allege sufficient material adjudicative facts that would mandate a hearing. See Codd v. Velger, 429 U.S. 624, 627 (1977) (observing that, if a due process hearing is "to serve any useful purpose, there must be some factual dispute" that "has some significant bearing" on the case); see also Bally Mfg. Corp. v. N.J. Casino Control Comm'n, 85 N.J. 325, 334 (1981) ("Only where the proposed [government] action is based on disputed adjudicative facts is an evidentiary hearing mandated.").

Here, Clarios sought to examine DeNovo's breach of its remediation duties, failure to increase the RFS Trust balance, "potential misuse" of the RFS Trust, and "estimate of remaining remediation costs." At oral argument, Clarios elaborated upon its intentions, stating that it sought "to supplement the information that the [DEP] has so that there's a complete record." The factual issues regarding which Clarios sought to "supplement the . . . record" have no "significant bearing" on the DEP's rationale for rescinding the RIP Waiver -- namely, that remediation had stopped, the Site was out of compliance, and the RFS Trust was empty. If the DEP continues its enforcement efforts to rekindle

remediation, N.J.A.C. 7:26C-9.3 states that Clarios will receive a self-executing administrative order entitling Clarios to request an adjudicatory hearing under N.J.A.C. 7:26C-9.10, at which time Clarios could raise the above issues.

## VI.

For the foregoing reasons, we affirm the judgment of the Appellate Division.

CHIEF JUSTICE RABNER and JUSTICES PIERRE-LOUIS, WAINER APTER, FASCIALE, and NORIEGA join in JUSTICE HOFFMAN's opinion. JUSTICE PATTERSON did not participate.